TIN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-02703-KLM

TODD WEITZMAN,

    Plaintiff,

v.

CITY AND COUNTY OF DENVER,
DENVER HEALTH AND HOSPITAL AUTHORITY d/b/a DENVER HEALTH MEDICAL CENTER;
PETER CRUM, M.D., in his individual and official capacity;
VALERIE SNYDER, L.P.N., in her individual capacity;
MARCELLINA ROSALES, L.P.N., in her individual capacity;
ANN JACOBSON, LPN, in her individual capacity;
GLEN MCCOY L.P.N., in his individual capacity;
J.M. L.P.N., in her individual capacity;
DENVER HEALTH MEDICAL CENTER JANE DOE 1, in her individual capacity,

    Defendants.

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiff, by and through his attorneys, David A. Lane, and Eleanor K. Wedum of KILLMER, LANE & NEWMAN, LLP, hereby bring this Amended Complaint and Jury Demand and allege as follows:

### INTRODUCTION

1. Todd Weitzman, an otherwise healthy man in his forties, went blind in one eye over the course of approximately two weeks while incarcerated at the Denver County Jail. Despite Mr. Weitzman's repeated written and verbal complaints that he was experiencing acute vision loss, Defendants were deliberately indifferent to his serious medical needs.

1

2. Mr. Weitzman had a common bacterial infection which is easily treated with a simple penicillin injection. However, if left untreated, it can lead to serious, permanent problems like brain damage, paralysis, and blindness.

3. The timely administration of a basic antibiotic by Denver County Jail medical personnel could have saved Todd Weitzman's sight. However, all the medical professionals who were directly confronted with Mr. Weitzman's reports of his rapidly deteriorating condition chose to ignore it or pass it off to someone else.

4. Plaintiff Weitzman brings legal claims under 42 U.S.C. §1983 against the City and County of Denver and its agents who violated his rights under the U.S. Constitution. Mr. Weitzman seeks damages and other relief. At all times relevant to this Complaint, Denver Health and all of its agents and employees were acting under color of state law.

## JURISDICTION AND VENUE

5. This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983.

6. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1367. Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988, and other relevant law.

7. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

## PARTIES

**Plaintiff:**

8. At all times pertinent hereto, Plaintiff Todd Weitzman was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

**Defendants:**

9. Defendant Denver is a Colorado municipal corporation. Denver's Department of Safety is responsible for the oversight, supervision, and training of the Denver Sheriff's Department. At all relevant times, Defendant Denver had a nondelegable duty to provide adequate medical care to inmates and detainees at the Van Cise-Simonet Detention Center.

10. Upon information and belief, Denver Health and Hospital Authority , D/B/A "Denver Health Medical Center" and "Denver Health" (hereinafter "Denver Health"), is a political subdivision of the State of Colorado with its principal office address at 777 Bannock Street, Denver, Colorado 80204.

11. Upon information and belief, at all relevant times, Defendant Peter Crum, M.D. was a citizen of the United States and a resident of and domiciled in Colorado and was acting under color of state law in his capacity as a treating physician who provided medical care to detainees and inmates at Denver's Van Cise-Simonet Detention Center (hereinafter the "Jail" or "Detention Center").

12. Upon information and belief, at all relevant times, Defendant Valerie Snyder, L.P.N. was a citizen of the United States and a resident of and domiciled in Colorado and was acting under color of state law in her capacity as a licensed practical nurse who provided medical care to detainees and inmates at the Jail.

13. Upon information and belief, at all relevant times, Defendant Marcellina Rosales, L.P.N. was a citizen of the United States and a resident of and domiciled in Colorado and was acting

under color of state law in her capacity as a licensed practical nurse who provided medical care to detainees and inmates at the Jail

14. Upon information and belief, at all relevant times, Defendant Ann Jacobson, L.P.N. was a citizen of the United States and a resident of and domiciled in Colorado and was acting under color of state law in her capacity as a licensed practical nurse who provided medical care to detainees and inmates at the Jail.

15. Upon information and belief, at all relevant times, Defendant Glen McCoy, L.P.N. was a citizen of the United States and a resident of and domiciled in Colorado and was acting under color of state law in his capacity as a licensed practical nurse who provided medical care to detainees and inmates at the Jail.

16. Upon information and belief, at all relevant times, Defendant Denver Health Medical Center Jane Doe No. 1 was a citizen of the United States and resident of and domiciled in Colorado, and was acting under color of state law in her capacity as a medical professional responsible for providing medical care to detainees and inmates at the Jail.

17. Upon information and belief, at all relevant times, Defendant J.M., L.P.N. ("Nurse J.M") was a citizen of the United States and resident of and domiciled in Colorado, was acting under color of state law in her capacity as a licensed practical nurse, and was responsible for providing medical care to detainees and inmates at the Jail.

**FACTUAL ALLEGATIONS**

18. Todd Weitzman was born in Plainfield, New Jersey and grew up in Piscataway, New Jersey. He moved to Colorado in 1996 after finishing college at Syracuse University.

19. When he arrived in Colorado, he began working as a programmer analyst at Software AG, a software company in Highlands Ranch, working to make code Y2K compliant for various companies.

20. While he was working at Software AG, Mr. Weitzman took it upon himself to further his education and went back to school. By 2000, he earned two advanced degrees from the University of Colorado, Denver: a Master of Business Administration (MBA), and a Master of Science in Information Systems.

21. In September 2015, Mr. Weitzman was arrested and charged with a misdemeanor. While he was awaiting disposition of his case, Mr. Weitzman was booked into the Denver jail, known as the Van Cise-Simonet Detention Center.

22. Medical care at the Denver Jail is provided by nurses and other medical professionals employed by Denver Health, and stationed at the Denver Jail pursuant to a contract between the City and County of Denver and Denver Health.

23. Upon information and belief, the nursing staff at the Denver Jail is often supervised and trained not only by the medical doctor (Dr. Crum), but also by a nurse in supervisory position who often has a title such as "floor nurse." The identity of this person at the time of Mr. Weitzman's incarceration is currently unknown, and therefore that supervisor will be identified as Denver Health Jane Doe 1.

24. In his initial intake appointment with medical, Mr. Weitzman was forthcoming about his known medical issues. Notably, he did not indicate any problems with his eyes.

25. Shortly after being admitted to the Jail, Mr. Weitzman began to have both medical and psychological issues. When Mr. Weitzman tried to voice his concerns to the Sheriff's Deputy in

his pod, the deputy told Mr. Weitzman that he had to give written notice (send a "kite") to medical.

26. Mr. Weitzman sent many detailed kites regarding his specific medical needs - everything from his difficulties getting his medications, to his issues with pain management for preexisting conditions like ulcerative colitis, back and foot pain, to his struggles with night terrors and his related concerns about how screaming and crying in his sleep might affect his life in the general jail population.

27. About two months into his time at the jail, Mr. Weitzman was placed into the segregated housing unit for his own protection. His night terrors, which included loud, sustained screaming and crying in his sleep, were disturbing other inmates and jail staff.

28. Despite the move, Mr. Weitzman continued to have issues getting his medication on time and in the correct doses. He diligently followed jail protocol, and sent detailed kites to have his medical needs met.

29. Finally, Mr. Weitzman had so much trouble getting his medications in the appropriate doses and at the correct time, he was forced to file a grievance against one of the nurses. This began a pattern of many of Mr. Weitzman's requests for medical attention being flatly ignored or brushed off, and made scheduling a doctor's appointment very difficult.

30. On or around November 5, 2015, Mr. Weitzman finally managed to get an appointment with Defendant Crum, who, upon information and belief, is the only medical doctor assigned to the Denver Jail. They discussed the issues Mr. Weitzman was having with his ulcerative colitis, as well as his problems managing his back pain and pain from a poorly healed broken foot. After that appointment, Mr. Weitzman was scheduled for a follow-up appointment on November 19, 2015.

31. On or around November 10, 2015, Mr. Weitzman complained to a deputy about a bad rash all over his body, but maintained that it did not itch. The Deputy agreed that the rash looked serious, and said he would pass along the message.

32. The deputy on the pod then told the nurse about Mr. Weitzman's body-wide rash, but the nurse simply refused to see Mr. Weitzman. Instead, the Deputy returned with the message that Mr. Weitzman had to send a kite, which he promptly did.

33. When Defendant Marcellina Rosales finally addressed that kite, on or around November 11, 2015, her only proposed treatment plan for Mr. Weitzman's long-lasting, wide-ranging rash was for him to be evaluated in nearly three weeks, on December 1, 2015.

34. On or around November 15, 2015, Mr. Weitzman submitted an inmate request for medical assistance in which he indicated that he was experiencing blurred vision. In the same kite, he reported that his rash had gotten significantly worse, and had continued to spread.

35. In Defendant Valerie Snyder's assessment dated November 16, 2015, she did not even acknowledge Mr. Weitzman's complaint about his vision. However, her assessment notes confirm that Mr. Weitzman's rash was indeed all over his body. Defendant Snyder also noted that Mr. Weitzman had been using a cream for his rash since November 3 (nearly two weeks), without improvement.

36. Despite the serious complaint that Mr. Weitzman was experiencing blurred vision, Defendant Snyder did nothing to address that issue.

37. In her note on Mr. Weitzman's kite, Defendant Snyder reminded Mr. Weitzman about his appointment on November 19.

38. Even though that appointment had been scheduled for nearly two weeks, Mr. Weitzman's follow-up appointment with Dr. Crum for November 19, 2015 was abruptly cancelled without any explanation.

39. On or around November 23, 2015, Mr. Weitzman finally had his follow-up appointment with Defendant Crum. Mr. Weitzman explained the issue he was having with his eyesight, and Defendant Crum agreed that Mr. Weitzman should see a specialist. Given the issues he was having with his eyes, Defendant Crum said Mr. Weitzman should see an ophthalmologist.

40. However, Defendant Crum decided that, despite the seriousness of vision loss, that they should wait a week before contacting a specialist.

41. Mr. Weitzman was very concerned about having to wait a week, but he made the decision to trust the doctor and defer to his medical judgment. Little did Mr. Weitzman know how much worse things would get in less than a week.

42. After returning from his appointment with Defendant Crum, Mr. Weitzman sent yet another kite in which he plainly stated that he was seeing black spots in one of his eyes. He also renewed his complaint about his rash, and yet again asserted that it was getting worse.

43. The only indication that this kite was ever even seen by medical personnel is Defendant Ann Jacobson's stamped signature in the "triage box" in one corner, where she checked the box designating Mr. Weitzman's kite as "routine" although it should have been anything but. As usual, the assessment notes do not even address Mr. Weitzman's dire complaint that he sees "black spots out of 1 eye" and there is no indication that Defendant Jacobson reported or addressed this urgent request for medical attention.

44. Despite months of unresponsiveness from the Denver Health staff, Mr. Weitzman sent yet another kite on or around December 3, 2015. He reported yet again that he was losing vision

in one eye, and ended the kite with a starred note reading "real concerned about my vision." In his assessment, Defendant Glen McCoy finally acknowledged (perhaps for the first time in writing) Mr. Weitzman's complaints about his vision, writing, "[patient] states that [he] is having problem seeing out of R Eye (sic)."

45. In the treatment plan, Defendant McCoy simply noted that Mr. Weitzman had an appointment on December 21, 2015. However, Mr. Weitzman was scheduled to be released on December 12, 2015, a fact which he repeatedly told medical staff at the jail.

46. In a second kite dated December 9, 2015, Mr. Weitzman stated, in no uncertain terms, that he was almost completely blind in his right eye, and that the vision loss was starting in his left. He also mentioned that, although Dr. Crum had advised on November 13, 2015 that they wait *one* week, the nurses had scheduled him for a follow-up appointment *three* weeks later.

47. Despite Mr. Weitzman's serious and well-articulated concerns, Defendant Nurse J. M., whose signature on the kite is largely illegible, wrote in her assessment "[inmate] walking around pod in no apparent distress. Not favoring one eye over the other." She also wrote that "[inmate] states no complaints when asked" which is simply not true. Mr. Weitzman was panicked about his rapidly deteriorating eyesight and Denver Health's apparent unwillingness to do anything about it. He tried to get the medical attention he needed through any avenue possible, and certainly would not have told a nurse that he had "no complaints."

48. In her treatment plan on the December 9 kite, Defendant Nurse L.M. reiterated the fact that Mr. Weitzman had a doctor's appointment on December 21, 2015, nine days *after* his release date. Again, Defendant L.M. falsely reported that, when reminded of this appointment, "[inmate] stated that was fine." This appointment date was absolutely not fine with Mr. Weitzman, and he repeatedly tried to inform the medical staff that he was supposed to be released before that date.

49. Desperate to find another avenue by which to be seen by someone who would take his condition seriously, Mr. Weitzman filled out an inmate message form, wherein he explained that "I am literally blind (90%) in my right eye and it got worse today. It's starting to happen in my left eye now (3 days ago). I kited medical but want me to wait for my doc's appt. The doc knows about this but wanted to wait a week for my follow-up appointment. It's been over 2 weeks." He passed this message form to the deputy in his pod.

50. Callously, the pod deputy simply wrote "RN wants you to kite! Does not cost to kite. Cost's [sic] to be seen." He then returned Mr. Weitzman's message without delivering it to medical, despite the seriousness of its content.

51. Mr. Weitzman was released from jail on December 12, 2015 without ever having seen Dr. Crum again, or having seen a specialist.

52. Immediately upon his release, Mr. Weitzman rushed to his doctor, who immediately referred him to the specialists at the Denver Retina Center.

53. During a visual exam, the doctor at the Denver Retina Center immediately diagnosed Mr. Weitzman with ocular syphilis and referred him to Rose Medical Center to confirm that diagnosis with bloodwork.

54. Mr. Weitzman's bloodwork came back positive for syphilis, and he was admitted to Rose Medical Center for two weeks of aggressive antibiotic treatment.

55. While the course of antibiotics stopped the progress of the infection, and the deterioration of Mr. Weitzman's eyesight, the vision loss he had already suffered could not be reversed.

56. Mr. Weitzman was ultimately diagnosed with three conditions, all of which were caused by the ocular syphilis: pseudopapilledema of the optic disc of his right eye, toxic maculopathy in his right eye, and lattice degeneration of the retina in his left eye.

57. Due to Defendants deliberate indifference to his serious medical needs while he was in jail, Mr. Weitzman ultimately lost 70% of the vision in his right eye. His pre-existing nearsightedness has also gotten worse.

58. Had Mr. Weitzman been allowed to see a specialist in a timely manner, his eyesight could have been saved. He will never regain the vision he has lost.

59. Mr. Weitzman also continues to require intensive and time consuming medical treatment, including but not limited to painful laser treatments.

60. Because of these issues with his eyesight, Mr. Weitzman's ability to work has been substantially limited. It is difficult for him to do everyday tasks, such as working from a computer screen.

61. Mr. Weitzman has also suffered from a deep depression. He is devastated that he will have to live like this for the rest of his life, as a result of something that could have been so easily prevented.

62. Mr. Weitzman's totally preventable blindness while in the care of the Denver County jail is just one example of Denver's overwhelmingly common deliberate indifference to the serious medical needs of inmates.

63. The City of Denver has created, fostered, tolerated, and perpetuated an environment and culture of deliberate indifference to the constitutional and statutory rights of citizens and residents. It was foreseeable and virtually inevitable that a tragic incident like the one involving Todd Weitzman would happen under the circumstances.

64. What follows are just a few examples of notable cases which showcase Denver's longstanding pattern and practice of deliberate indifference to the serious medical needs of the inmates at its jail.

65. In 2008, the City of Denver and Denver Health paid a combined $7 million to the family of Emily Rae Rice, who died while in custody of the Denver Sheriff's Department. Ms. Rice's lawsuit asserted that the City's and Denver Health's treatment of her violated her constitutional rights, leading directly to her death. This included claims against the defendants for deliberate indifference to Ms. Rice's serious medical needs. The City also destroyed or otherwise tampered with video and other evidence, and engaged in a cover-up of the wrongdoing. After initially denying any liability on any of the claims, the Defendants paid $7 million and agreed to many policy changes.

66. Also in 2008, Denver paid $150,000 to Timothy Thomason, a terminally ill man who was deprived of medical care while in the City jail. Mr. Thomason was arrested on charges of cultivating marijuana. While being transported to jail, he informed the officers that he was suffering from terminal Stage IV non-Hodgkin lymphoma, and that he was taking massive amounts of pain killers and anxiety medications. The officers assured him that they would bring his medications to the jail. Once he arrived at the Pre-Arraignment Detention Facility, however, Denver sheriffs ignored his repeated pleas for medication. A judge ordered his release, but Denver forced him to spend several more hours in jail, without his medication, until he suffered a seizure, banging his head on the cement floor of his cell. Mr. Thomason alleged that his treatment by the Denver Sheriff's Department violated his constitutional rights.

67. Denver's killing of Marvin Booker in the Denver Jail in 2010 provides another poignant example of Denver's custom policy and practice of deliberate indifference to serious medical needs. Importantly, Denver stipulated in 2014 that the individual defendants' conduct in each of their interactions with Mr. Booker on July 9, 2010 were consistent with the customs, policies, and practices of the City and County of Denver – and that a finding of liability on any of the

plaintiffs' Section 1983 claims against any one (or more) of the individual defendants constitutes a finding of liability against Denver as well.

68. As recently as September 2017, Denver agreed to pay $65,000 to Keith Gibson after Denver affirmatively and deliberately increased and enhanced the danger to which Mr. Gibson was exposed by assigning him to a third-floor cell despite his known seizure disorder and associated bottom-tier restrictions. Mr. Gibson had a seizure in July 2014 while starting to descend the stairs the Denver Defendants had illegally forced him to descend, tumbled over the staircase railing to the concrete floor several feet below, and suffered serious injuries as a result of the fall.

69. On November 1, 2017, Denver announced that it would be settling a case wherein deputies fatally restrained inmate Michael Marshall while he was suffering from a non-violent mental health crisis. As Mr. Marshall choked and aspirated on his own vomit and lost consciousness, the Defendant Denver Sheriffs and Denver Health nurses refused to provide him life-saving medical care, and instead strapped Michael Marshall's limp body into a restraint chair and further restricted his breathing with a spit mask. Denver has agreed to pay the Marshall family $4.65 million for, among other things, Denver official's deliberate indifference to Mr. Marshall's serious medical needs while he was being housed at the Van Cise-Simonet Detention Center.

### **FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment - Failure to Provide Medical Care and Treatment**
**(Against All Individual Defendants)**

70. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth therein.

71. At all times relevant to the allegations in this Complaint, Defendants were acting under

color of state law.

72. Todd Weitzman was a citizen of the United States and all of the individual Defendants are persons under 42 U.S.C. § 1983.

73. Todd Weitzman had a clearly established right under the Fourteenth Amendment to the United States Constitution to be free from deliberate indifference to his known serious medical needs.

74. Each individual Defendant knew or should have known that deliberately disregarding Plaintiff's repeated, unambiguous assertions that he was losing his vision posed a substantial risk of serious harm to Plaintiff's safety; yet Defendants' deliberately disregarded that obvious, substantial risk, and failed to take reasonable measures to protect Plaintiff from that risk.

75. At all times relevant to the allegations in this Complaint, each individual Defendant knew of and disregarded the excessive risks associated with Todd Weitzman's serious and rapidly worsening medical condition.

76. Nevertheless, with deliberate indifference to Todd Weitzman's constitutional right to adequate medical care, as provided by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Defendants knowingly failed to examine, treat, and/or care for Plaintiff's worsening condition. They did so despite their knowledge of Plaintiff's serious medical needs, thereby placing him at risk of serious physical harm. Therefore, Defendants knew or were aware that Plaintiff faced a substantial risk of harm and disregarded this excessive risk by failing to take measures to reduce it.

77. All Defendants violated Plaintiff's clearly established constitutional rights.

78. All Defendants acted intentionally, maliciously, and/or with reckless and/or deliberate indifference to Plaintiff's federally-protected rights.

79. The acts or omissions of each Defendant were the legal and proximate cause of Mr. Weitzman's injuries

80. The intentional actions or inactions of each individual Defendant as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

**SECOND CLAIM FOR RELIEF**
**(§ 1983 – Municipal Liability for Failure to Train and Supervise)**
(Against City and County of Denver, Denver Health)

81. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

82. At all relevant times, Denver had a non-delegable duty to provide constitutionally adequate medical care for inmates.

83. As described above, Defendants City and County of Denver and Denver Health have repeatedly failed to properly train and supervise their employees to recognize and appropriately respond to medical emergencies.

84. These violations by Jail officials of inmates' constitutional rights to receive adequate medical care were so widespread and flagrant that in the proper exercise of its official responsibilities, Defendants City and County of Denver and Denver Health knew, or should have known, that its employees would fail to adequately identify and respond appropriately to medical emergencies, violating detainees' constitutional rights.

85. Defendants City and County of Denver and Denver Health were deliberately indifferent to the obvious serious medical needs of patients and jail detainees, knowing that potentially fatal consequences could be suffered by such individuals (including Mr. Weitzman) by failing to properly train and supervise their employees. Defendants City and County of Denver and

Denver Health could have and should have pursued reasonable methods for the training and supervising of such employees, but failed to do so.

86. Defendants City and County of Denver's and Denver Health's policies, customs, or practices in failing to properly train and supervise their employees were the moving forces and proximate cause of the violation of Mr. Weitzman's constitutional rights.

87. The acts or omissions of Defendants City and County of Denver and Denver Health caused Mr. Weitzman damages in that he suffered physical and mental pain during the four months he was incarcerated at the Denver County Jail, and ultimately lead to Mr. Weitzman's significant vison loss in his right eye and some in his left eye.

88. The actions and inactions of Defendants City and County of Denver and Denver Health as described herein deprived Mr. Weitzman of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

**THIRD CLAIM FOR RELIEF**
**(§ 1983 – Supervisory Liability for Failure to Train and Supervise)**
(Against Defendant Crum and Jane Doe 1 (referred to herein as "Supervisor Defendants")

89. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

90. The Supervisor Defendants each have duties to train and supervise deputy sheriffs, nurses and other jail personnel in order to ensure the safety and well-being of detainees in the jail facility.

91. Each of the Supervisor Defendants failed to discharge these duties.

92. The Supervisor Defendants acted intentionally in failing to adequately train and supervise nurses and other jail personnel.

93. The Supervisory Jail Defendants' failure to properly train and supervise their subordinate employees was the moving force and proximate cause of the violation of Plaintiff's constitutional rights.

94. The acts or omissions of the Supervisor Defendants caused Mr. Weitzman damages in that he suffered intense physical discomfort and mental pain during the approximately five weeks leading up to his release from jail.

95. The actions and inactions of the Supervisor Defendants as described herein deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and grant:

(a) Appropriate relief at law and equity;

(b) Declaratory relief and other appropriate equitable relief;

(c) Economic losses on all claims allowed by law;

(d) Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f) Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(g) Pre- and post-judgment interest at the highest lawful rate;

(h) Any further relief that this Court deems just and proper, and any other relief as

allowed by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 9th day of March, 2018.

                                                                   KILLMER, LANE & NEWMAN, LLP

                                                                   *s/ Eleanor K. Wedum*_____
                                                                   David A. Lane
                                                                   Eleanor K. Wedum
                                                                   KILLMER, LANE & NEWMAN, LLP
                                                                   1543 Champa Street, Suite 400
                                                                   Denver, Colorado 80202
                                                                   (303) 571-1000
                                                                   (303) 571-1001
                                                                   dlane@kln-law.com
                                                                   ewedum@kln-law.com