**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-02703-KLM

TODD WEITZMAN,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality,
DENVER HEALTH AND HOSPITAL AUTHORITY d/b/a DENVER HEALTH MEDICAL
CENTER;
PETER CRUM, M.D., in his individual and official capacity;
VALERIE SNYDER, L.P.N., in her individual capacity;
MARCELLINA ROSALES, L.P.N., in her individual capacity;
ANN JACOBSON, LPN, in her individual capacity;
GLEN MCCOY L.P.N., in his individual capacity;
J.M. L.P.N., in her individual capacity;
DENVER HEALTH MEDICAL CENTER JANE DOE 1, in her individual capacity,

      Defendants.

---

**PLAINTIFF'S RESPONSE TO DEFENDANT CITY AND COUNTY OF DENVER'S**
**MOTIONS TO DISMISS**

---

      Plaintiff Todd Weitzman, by and through his attorneys David Lane and Eleanor Wedum

of KILLMER, LANE & NEWMAN, LLP, hereby submits his response to Defendant Denver's Motion

to Dismiss Plaintiff's Amended Complaint [Doc. 35] and in support thereof states as follows:

**INTRODUCTION**

      In September 2015, Todd Weitzman was booked into the Denver County Jail. During his

intake screening, he did not have any complaints regarding his eyesight. A mere two months

later, he was almost totally blind in one eye, and quickly losing the vision in the other due to a

1

common bacterial infection. This acute vision loss could have easily been prevented had Mr.

Weitzman simply been allowed to see an ophthalmologist when the symptoms first appeared.

Instead, Defendant Crum never made any such appointment, and Denver employees remained

deliberately indifferent to Mr. Weitzman's desperate pleas for help, and explicit statements that

he was going blind. As a result of the Defendants' deliberate indifference to his serious medical

needs, Plaintiff has lost significant vision.

### FACTUAL BACKGROUND

In September 2015, Mr. Weitzman was arrested and charged with a misdemeanor. Am.

Compl. [Doc. 30] ¶ 21. While he was awaiting disposition of his case, Mr. Weitzman was

booked into the Denver jail, known as the Van Cise-Simonet Detention Center. *Id.*  In his initial

intake interview with medical, Mr. Weitzman was forthcoming about his known medical issues.

Notably, he did not indicate any problems with his eyes. [Doc. 30] ¶ 24.

On or around November 10, 2015, Mr. Weitzman complained to a deputy about a bad

rash all over his body, but maintained that it did not itch. [Doc. 30] ¶ 31.  The Deputy agreed that

the rash looked serious, and said he would pass along the message. *Id.* The deputy on the pod

then told the nurse about Mr. Weitzman's body-wide rash, but the nurse simply refused to see

Mr. Weitzman. [Doc. 30] ¶ 32. Instead, the Deputy returned with the message that Mr. Weitzman

had to send a kite, which he promptly did. *Id.* When Defendant Marcellina Rosales finally

addressed that kite, on or around November 11, 2015, her only proposed treatment plan for Mr.

Weitzman's long-lasting, wide-ranging rash was for him to be evaluated in nearly three weeks,

on December 1, 2015. [Doc. 30] ¶ 33.

On or around November 15, 2015, Mr. Weitzman kited to indicate that he was

experiencing blurred vision. [Doc. 30] ¶ 34. In the same kite, he reported that his rash had gotten

significantly worse, and had continued to spread. *Id.* Defendant Valerie Snyder did not even acknowledge Mr. Weitzman's complaint about his vision in her assessment, dated November 16, 2015. [Doc. 30] ¶ 35.  Her assessment notes do confirm that Mr. Weitzman's rash was indeed all over his body. *Id.* Despite the serious complaint that Mr. Weitzman was experiencing blurred vision, Defendant Snyder did nothing to address that issue. [Doc. 30] ¶ 36. In her note on Mr. Weitzman's kite, Defendant Snyder reminded Mr. Weitzman about his appointment on November 19. [Doc. 30] ¶ 37.  However, that appointment was abruptly cancelled without any explanation. [Doc. 30] ¶ 38.

On or around November 23, 2015, Mr. Weitzman had an appointment with Defendant Crum and explained the issue he was having with his eyesight. [Doc. 30] ¶ 39.  Defendant Crum agreed that Mr. Weitzman should see an ophthalmologist. *Id.* Despite the seriousness of vision loss, Defendant Crum told Mr. Weitzman he had to wait a week before contacting a specialist. [Doc. 30] ¶ 40.

After returning from his appointment with Defendant Crum, Mr. Weitzman sent yet another kite in which he plainly stated that he was seeing black spots in one of his eyes. [Doc. 30] ¶ 42.  He also renewed his complaint about his rash, and yet again asserted that it was getting worse. *Id.* The only indication that this kite was ever even seen by medical personnel is Defendant Ann Jacobson's stamped signature in the "triage box" in one corner, where she checked the box designating Mr. Weitzman's kite as "routine" although it was anything but. [Doc. 30] ¶ 43.  As usual, the assessment notes do not even address Mr. Weitzman's dire complaint that he sees "black spots out of 1 eye" and there is no indication that Defendant Jacobson reported or addressed this urgent request for medical attention. *Id.*

Despite months of deliberate indifference from the Denver Health staff, Mr. Weitzman sent yet another kite on or around December 3, 2015. [Doc. 30] ¶ 44. He reported yet again that he was losing vision in one eye, and ended the kite with a starred note reading "real concerned about my vision." *Id.* In his assessment, Defendant Glen McCoy finally acknowledged (perhaps for the first time in writing) Mr. Weitzman's complaints about his vision, writing, "[patient] states that [he] is having problem seeing out of R Eye (sic)." *Id.*  In the treatment plan, Defendant McCoy simply noted that Mr. Weitzman had an appointment on December 21, 2015. [Doc. 30] ¶ 45. However, Mr. Weitzman was scheduled to be released on December 12, 2015, a fact which he repeatedly told staff at the jail. *Id.*

On December 9, 2015, Mr. Weitzman sent a kite reporting that he was almost completely blind in his right eye, and that the vision loss was starting in his left. [Doc. 30] ¶ 46.  He also mentioned that, although Dr. Crum had advised on November 23, 2015[1] that they wait one week, the nurses had merely scheduled him for a follow-up appointment with Dr. Crum (not with an ophthalmologist) three weeks later. *Id.*

Despite Mr. Weitzman's serious and well-articulated concerns, Defendant Nurse J. M. wrote in her assessment "[inmate] walking around pod in no apparent distress. Not favoring one eye over the other." She also wrote that "[inmate] states no complaints when asked" which is simply not true. [Doc. 30] ¶ 47.  Mr. Weitzman was panicked about his rapidly deteriorating eyesight and Denver Health's apparent unwillingness to do anything about it. *Id.* He tried to get the medical attention he needed through any avenue possible, and certainly would not have told a nurse that he had "no complaints." *Id.* In her treatment plan on the December 9 kite, Defendant

---

[1] Defendant Denver correctly notes in its footnote on page 5 that the Amended Complaint contains a typo regarding the date of Mr. Weitzman's second appointment with Dr. Crum. "November 13, 2015" should be "November 23, 2015."

Nurse J.M. reiterated the fact that Mr. Weitzman had a doctor's appointment on December 21, 2015, nine days after his release date. [Doc. 30] ¶ 48.  Again, Defendant J.M. falsely reported that, when reminded of this appointment, "[inmate] stated that was fine." *Id.* This appointment date was absolutely not fine with Mr. Weitzman, and he repeatedly tried to inform the medical staff that he was supposed to be released before that date. *Id.*

Desperate to find another avenue by which to be seen by someone who would take his condition seriously, Mr. Weitzman filled out an inmate message form, wherein he explained that "I am literally blind (90%) in my right eye and it got worse today. It's starting to happen in my left eye now (3 days ago). I kited medical but want me to wait for my doc's appt. The doc knows about this but wanted to wait a week for my follow-up appointment. It's been over 2 weeks." [Doc. 30] ¶ 49. He passed this message form to the deputy in his pod. *Id.* Callously, the pod deputy simply wrote "RN wants you to kite! Does not cost to kite. Cost's [sic] to be seen." [Doc. 30] ¶ 50.  He then returned Mr. Weitzman's message without delivering it to anyone, despite the seriousness of its content. *Id.*

Mr. Weitzman was released from jail on December 12, 2015 without ever having seen Dr. Crum again, or having seen a specialist. [Doc. 30] ¶ 51. Mr. Weitzman was treated for ocular syphilis with a routine course of antibiotics, but the vision loss he suffered while in the Denver County Jail could not be reversed. [Doc. 30] ¶ 53-55. Due to Defendants deliberate indifference to his serious medical needs while he was in jail, Mr. Weitzman ultimately lost 70% of the vision in his right eye. [Doc. 30] ¶ 57.  His pre-existing nearsightedness has also gotten worse. *Id.*

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) provides that to state a claim upon which relief can be granted, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The United States Supreme Court has interpreted this requirement as facial plausibility: "a complaint must contain enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1190-91 (10th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausible in this context does not mean "likely to be true." *Robbins v. Okla ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008). Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009). A plaintiff need not establish a prima facie case or include specific factual allegations to state a claim for relief; the plaintiff "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Khalik*, 671 F.3d at 1191 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).

A defendant may assert that the plaintiff has failed to state a claim upon which relief can be granted by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). "There is a strong presumption against dismissal for failure to state a claim under Rule 12(b)(6)." *Shell v. Am. Family Rights Ass'n, 899 F. Supp. 2d 1035, 1055 (D. Colo. 2012).* "[G]ranting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cty. of Denver,* 567 F.3d 1169, 1178 (10th Cir. 2009) (citation omitted). In reviewing a Rule 12(b)(6) motion, the court must accept as true well-pleaded factual allegations in the complaint, viewing these allegations in the light most favorable to the plaintiff, and determine whether they plausibly

give rise to an entitlement to relief.  *Iqbal,* 556 U.S. at 679; *Kerber v. Qwest Grp. Life Ins. Plan,* 647 F.3d 950, 959 (10th Cir. 2011). In making this determination, the court must consider the complaint in its entirety.  *Kennedy v. Peele,* 552 F.App'x 787, 792 (10th Cir. 2014) (unpublished).

LEGAL ARGUMENT

## I. Denver has a custom, policy, or practice of violating the constitutional rights of its inmates.

Municipalities are considered "persons" subject to suit under 42 U.S.C. § 1983 for civil rights violations. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A municipality or other local government unit is liable for constitutional torts if the alleged unconstitutional acts implicate a policy, ordinance, or custom of the local government. *Id.* at 690-94; *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 308 n.4 (10th Cir. 1985). A municipality is responsible under § 1983 when the execution of a government policy or custom actually caused an injury of constitutional dimensions. *Monell*, 436 U.S. at 694; *D.T. v. Indep. Sch. Dist.*, 894 F.2d 1176, 1187 (10th Cir. 1990). To ultimately prevail on a municipal liability claim, Plaintiffs must establish "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Commr's*, 151 F.3d 1313, 1316 (10th Cir. 1998). The existence of a policy or custom can be established in many ways, including demonstrating the existence of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to

7

adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation and quotations omitted).

Plaintiff will address both elements of Defendant Denver's municipal liability in turn.

### A. Defendant Denver was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment.

The United States Supreme Court has long made clear that inmates have a constitutional right to medical care:

> An inmate must rely on prison authorities to meet his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the [Eighth] Amendment.  In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common law view that it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.

*Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) (internal quotation marks and citations omitted). A prison official violates an inmate's constitutional rights if he acts with "deliberate indifference to serious medical needs" of the prisoner, as such conduct "constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment," and, "[t]his is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." *Id.* at 104-05. The Supreme Court reasons:

> When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. . . . The rationale for this

principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs – e.g., food, clothing, shelter, medical care, and reasonable safety – it transgresses the substantive limits on state action set by the Eighth Amendment[.]"

*Helling v. McKinney*, 509 U.S. 25, 32 (1993) (quoting *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 199-200 (1989)).

"The test for constitutional liability of prison officials involves 'both an objective and a subjective component.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). The objective component is met if the medical need is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The subjective component is met if a prison official "knows of and disregards an excessive risk to [prisoner] health or safety." *Id.* at 837. The circumstances surrounding Mr. Weitzman's vision loss satisfies both components.

### 1. <u>Mr. Weitzman suffered an objectively serious medical need.</u>

As described more fully above and in Plaintiff's Amended Complaint, Mr. Weitzman's sudden and medically preventable vision loss is an objectively serious medical need. [Doc. 30] ¶¶ 52-60. A medical need is sufficiently serious to implicate the Eighth Amendment "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)) (further quotation omitted). Other courts in the Tenth Circuit have held that allegations of "a permanent [vision] loss and considerable pain caused by delay in referral to a medical

specialist...are 'sufficiently serious' to satisfy the deliberate indifference objective prong." *Randolph v. Glanz*, 2016 U.S. Dis. LEXIS 126311, at *9-*10 (N.D. Okla. Sep. 16, 2016).

Mr. Weitzman lost 70% of the vision in one of his eyes as a result of Defendants' deliberate failure to provide him with prompt medical attention to treat his obvious difficulty seeing (including blurred vision, black spots in his vision, and total blindness in certain fields of his vision). [Doc. 30] ¶¶ 57, 34, 39, 42, 44. When Mr. Weitzman was finally see by a doctor, Defendant Crum acknowledged the seriousness of Mr. Weitzman's condition and stated that Mr. Weitzman should see a specialist. [Doc. 30] ¶ 39. However, Defendant Crum also recommended that Mr. Weitzman wait a week before even being allowed to schedule an appointment with a specialist, let alone actually seeing said specialist. [Doc. 30] ¶ 40. The harm Mr. Weitzman suffered was, therefore, without doubt, sufficiently serious to meet the objective component.

### 2. Denver knew of and disregarded the significant risk to Mr. Weitzman's health.

Under the subjective prong of the deliberate indifference analysis, "Plaintiff must establish that the defendant(s) knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Sellers v. Butler*, 2005 U.S. Dist. LEXIS 5126, at *16 (D. Kan. Mar. 29, 2005). Deliberate indifference to the serious medical needs of an inmate is proscribed by the Eighth Amendment, and is a grave constitutional violation. "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). "Deliberate indifference in this context does not require proof of an intent to inflict pain nor a detailed inquiry into the officials' state of mind, but the officials' conduct or lack of

conduct must demonstrate a knowing indifference to serious medical needs." *Sellers,* 2005 U.S. Dist. LEXIS at *19.

There is no doubt that Denver Sheriffs knew about Mr. Weitzman's rapidly deteriorating eyesight. Such a situation would cause any reasonable person to panic, and that is precisely what Mr. Weitzman did. [Doc. 30] ¶ 47. When his entreaties to medical staff failed, Mr. Weitzman wrote out and delivered his desperate plea for help to the deputy on his pod. [Doc. 30] ¶ 49. Even though the note unambiguously indicated the dire medical straits in which Mr. Weitzman found himself (including words like "literally blind"), the deputy simply returned the note, saying that it was written on the wrong form. [Doc. 30] ¶ 50.

### 3.   Plaintiff has pled sufficient facts to show deliberate indifference by Denver Health employees which are attributable to Defendant Denver.

Defendant Denver argues that, because of its contractual relationship with Denver Health, and Denver Health's status as a separate governmental entity, that it cannot be held responsible for the harm done by Denver Health to inmates in Denver's custody. *Deft. Denver's Mot. Dismiss*, p. 9, [Doc. 35]. This, however, is simply untrue. "The government's duty to provide adequate medical care is non-delegable." *Trujillo v. City & County of Denver*, 2016 U.S. Dist. LEXIS 175388, at *33 (D. Colo. Sep. 7 2016).

The court in *Trujillo* addressed the same arguments Denver now makes here; namely that "the non-delegable duty doctrine does not apply because Denver Health is a public entity, and the doctrine only extends to a government entity's contracting with a private company for the provision of health care." *Id.* at *34; [Doc. 35] p. 9.   In that case, Judge Jackson found decisions from other circuits to be persuasive on this issue, holding that Denver's "argument must fail because it does not account for the important aim of preventing a public entity from avoiding

liability by strategically choosing to contract with another public entity." *Trujillo,* at *39. This, of course, is not a novel idea, but rather the logical extension of the longstanding jurisprudence that, "the State cannot, by choosing to delegate its constitutional duties to the professional judgment of others, thereby avoid all liability flowing from the attempted fulfillment of those duties under Section 1983." *Anglin v. City of Aspen*, 552 F. Supp. 2d 1229, 1244 (D. Colo. 2008) (citing *West v. Atkins*, 487 U.S. 42, 56 n. 14 (1988)).

At this stage in the pleadings, this court must accept the facts in the complaint as true and view those facts in the light most favorable to the Plaintiff. Under the facts of the complaint, and as more fully explained in Plaintiff's response to the Medical Defendants' Motion to dismiss, the deliberate indifference of Denver Health staff to Mr. Weitzman's serious medical needs is readily attributable to Defendant Denver. [Doc. 30] ¶¶ 82, 85-88.

B. **Mr. Weitzman has adequately alleged facts to support his claim that Denver's failure to train and supervise was the driving force behind the violation of his constitutional rights**.

As discussed above, Denver has a non-delegable duty to provide for the health of its inmates. *Id.* However, Denver Health has long shirked its duties to provide adequate healthcare, and Defendant Denver cannot now seek to avoid liability by claiming that it did not know about the pattern of unconstitutional conduct by its medical provider. [Doc. 30] ¶¶ 62-69.

Liability against an entity for failures in training, supervision and policymaking exists where the need for additional or different training was so obvious that the failure to provide the same was deliberately indifferent to the rights of the relevant public, and a moving force in the complained of injury. The Supreme Court and Tenth Circuit have held that inadequacy of training is actionable under 42 U.S.C. 1983 "where the failure to train amounts to deliberate indifference

to the rights of persons with whom the [government actors] come into contact." *Allen v. Muskogee, Okl.*, 119 F.3d 837, 841-42 (10th Cir. 1997) citing to *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

This need for more or different training or policy for state actors can be made obvious from a pattern of unconstitutional conduct, or absent a pattern of unconstitutional behavior, "if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." *Barney v. Pulsipher*, 143 F.3d 1299, 1307-1308 (10th Cir.1998).

Denver's failure to provide even the most basic level of supervision over its medical provider demonstrates deliberate indifference "as to its known or obvious consequences" toward persons with whom their personnel come into contact. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997). There are few basic functions more essential to everyday life than the ability to see, and few graver losses than the loss of one's eyesight.  Mr. Weitzman made his concerns known as soon as he began to experience difficulty seeing, and yet he was ignored or told his complaints were in the wrong format. [Doc. 30] ¶¶ 34, 50.  Nonetheless, Mr. Weitzman meticulously documented his rapid deterioration ([Doc. 30] ¶¶ 32, 34, 42, 44, 46, 49) and thus it was foreseeable that, without the intervention of a medical specialist, the decline would continue apace as the direct result of Defendants' custom of inadequately training, and supervising its personnel to correctly evaluate and treat potential and actual emergency medical situations, including infections requiring antibiotics.  *See Barney*, 143 F. 3d at 1307-1308; [Doc. 30] ¶ 63. Therefore, Plaintiff is entitled to the inference at this early stage that Defendant Denver has a pattern of deliberately indifferent conduct, as well as inadequate training and supervision of its

medical provider. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1319 (10th Cir. 2002) (reversing grant of summary judgment to County because Appellant has alleged the necessary facts that "County manifested deliberate indifference by failing to train its jail's prebooking officers to recognize OCD and handle sufferers appropriately.").

As repeatedly held in civil rights cases, factual disputes that must be further explored in discovery are not appropriately resolved at the motion to dismiss stage. *Petty v. Cnty. of Franklin, Ohio*, 478 F.3d 341, 348 (6th Cir. 2007) ("We are not convinced that the district court was correct in dismissing Petty's municipal-liability claim at the 12(b)(6) stage. . . We wonder how Petty would necessarily know, at the point of his *complaint,* and without the benefit of discovery, whether such a custom or policy might exist, and if it does exist, what its contours might be or how exactly it effected a violation of his constitutional rights."); *Titlow v. Corr. Med. Servs.,* 07-12083, 2008 WL 2697306 (E.D. Mich. July 3, 2008) ("As plaintiff points out, "[t]he issue [on a Rule 12(b)(6) motion] is not whether [plaintiffs] may ultimately prevail on [a] theory, but whether the allegations are sufficient to allow them to conduct discovery in an attempt to prove their allegations. . . Any suspicion about the type of policy or custom, if any, which resulted in the decisions at issue here may be examined during discovery. Its existence may be challenged during summary judgment."); *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842-43 (S.D. Tex. 2011) ("In the context of municipal liability, as opposed to individual officer liability, it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery. Accordingly, only minimal factual allegations should be required at the motion to dismiss stage.").

Even without the benefit of formal discovery, Plaintiff has identified a number of recent cases which serve to put Defendant Denver on notice that Denver Health has a pattern and practice of providing constitutionally deficient medical care (or providing no care at all, as the case may be) which rises to the level of deliberate indifference. [Doc. 30] ¶¶ 63-69. The Supreme Court has held that, in order to prevail on a municipal liability claim, "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a *particular* constitutional or statutory right will follow the decision." *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 411 (1997) (emphasis added). As explained above, the particular constitutional right being repeatedly and conspicuously violated by Denver is an inmate's rights to adequate medical treatment while in custody, and the Amended Complaint contains several examples which serve to put Denver on notice that their training and supervision is constitutionally inadequate.

In 2008, 2010, and 2017, three people, Emily Rice, Marvin Booker, and Michael Marshall, were killed as the result of Denver's deliberate indifference to their serious medical needs.  All three were ignored when they exhibited symptoms to Denver Sheriff's Deputies and then were denied treatment by Denver Health medical personnel.  Admittedly, Mr. Weitzman has the dubious distinction of having survived his encounter with the "healthcare" system at the Denver Jail, but surely Defendants cannot be arguing that it was unaware of these constitutional issues. The Amended Complaint also contains two cases where the inmate (like Mr. Weitzman) did not die, but nonetheless suffered physical harm due to Denver's deliberate indifference to their medical needs. [Doc. 30] ¶¶ 66, 68. The fact that these cases keep occurring again and again evince Denver's failure to train its employees to respond in an appropriate and timely manner- indeed to respond at all- to the serious medical needs of its inmates. [Doc. 30] ¶¶ 63-69, 83-87.

To establish causation, the Supreme Court has stated that the proper question in these entity-training claims is: "Would the injury have been avoided had the employee been trained under a program that was deficient in the identified respect?" *City of Canton v. Harris*, 489 U.S. 378, 391 (1978).  The Amended Complaint provides more than enough for the Court to plausibly infer that the answer to *Canton's* question is yes: Mr. Weitzman' injury would have been avoided had Defendant's employees been trained under a program that was not deficient in the identified respects of ignoring serious medical complaints such as blurred vision, seeing spots, and monocular blindness, as well as obtaining necessary emergent care for his obviously serious medical condition. [Doc. 30] ¶¶ 33, 35-37, 39-40, 43-50, 83-88.

As alleged in the Complaint, there was an obvious need to train and supervise medical staff at the Denver Jail to timely treat serious symptoms like those Mr. Weitzman had, and timely obtain evaluations by specialists, and there was an obvious probability that the failure to provide such training and supervision would cause an inmate like Mr. Weitzman to be permanently disabled by vision loss. [Doc. 30], ¶¶57-58. Also obvious was the need to implement a policy that would require medical providers to follow up with their patients in a timely manner, especially following the conclusion that the inmate's condition merited the input of a specialist *Id.* ¶39. Additionally, the Amended Complaint alleges that the medical staff at the Denver Jail acted in accordance with these policies in treating Mr. Weitzman: an ophthalmologist was never contacted, despite the fact that Defendant Crum determined as early as November 23, 2015 that the severity of Mr. Weitzman's condition merited one; and nursing staff never did anything to address Mr. Weitzman's complaints in his kites about his worsening condition. *Id.* ¶¶39, 43-51. Had any of these circumstances been otherwise, Mr. Weitzman would not have lost his eyesight. *See id.* at ¶58.

**CONCLUSION**

Wherefore, Plaintiff requests that this court deny Defendant City and County of Denver's

Motion to Dismiss Plaintiff's Amended Complaint in its entirety, and for any other relief which

is deemed just and proper.

Respectfully submitted this 25th day of May 2018.

*s/ Eleanor K. Wedum*_____
David Lane
Eleanor K. Wedum
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
dlane@kln-law.com
ewedum@kln-law.com

## **CERTIFICATE OF SERVICE**

I certify that on this 25th day of May 2018 I filed this **PLAINTIFF'S RESPONSE TO DEFENDANT CITY AND COUNTY OF DENVER'S MOTIONS TO DISMISS** via CM/ECF, and CM/ECF will generate a Notice of Electronic Filing to the following:


Scott Nixon
Nixon Shefrin Hensen Ogburn
5619 DTC Parkway, Suite 1200
Greenwood Village, CO 80111
snixon@nixonshefrin.com


Conor Farley
Assistant City Attorney
City and County of Denver
201 W Colfax Avenue, Section 1108
Denver, CO  80202
conor.farley@denvergov.org


*s/ Charlotte Bocquin Scull*
Paralegal