# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-02703-KLM

TODD WEITZMAN,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality,
DENVER HEALTH AND HOSPITAL AUTHORITY d/b/a DENVER HEALTH MEDICAL CENTER;
PETER CRUM, M.D., in his individual and official capacity;
VALERIE SNYDER, L.P.N., in her individual capacity;
MARCELLINA ROSALES, L.P.N., in her individual capacity;
ANN JACOBSON, LPN, in her individual capacity;
GLEN MCCOY L.P.N., in his individual capacity;
J.M. L.P.N., in her individual capacity;
DENVER HEALTH MEDICAL CENTER JANE DOE 1, in her individual capacity,

      Defendants.

---

## PLAINTIFF'S RESPONSE TO MEDICAL DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

---

      Plaintiff Todd Weitzman, by and through his attorneys David Lane and Eleanor Wedum, hereby submits his response the motion to dismiss the amended complaint filed by Defendants Denver Health and Hospital Authority ("Denver Health"), Peter Crum, M.D., Valerie Snyder, L.P.N., Marcellina Rosales, L.P.N., Ann Jacobson, L.P.N., Glen McCoy L.P.N[1], J.M. L.P.N, and Denver Health Nurse Jane Doe 1, collectively the "Medical Defendants," and in support thereof states as follows:

---

[1] Defendant McCoy filed his Joinder in Medical Defendants' Motion to Dismiss on May 4, 2018 [Doc. 45]. Plaintiff will address Defendant McCoy's arguments in this response.

## INTRODUCTION

In September 2015, Todd Weitzman was booked into the Denver County Jail. Am. Compl. During his intake screening, he did not have any complaints regarding his eyesight. A mere two months later, he was almost totally blind in one eye, and quickly losing the vision in the other due to a common bacterial infection. This acute vision loss could have easily been prevented had Mr. Weitzman simply been allowed to see an ophthalmologist when the symptoms first appeared. Instead, Defendant Crum decided that to wait a week before allowing Mr. Weitzman to make an appointment with the specialist.  That appointment was never made, and Denver employees remained deliberately indifferent to Mr. Weitzman's desperate pleas for help, and explicit statements that he was going blind.

## FACTUAL BACKGROUND

In September 2015, Mr. Weitzman was arrested and charged with a misdemeanor. Am. Compl. [Doc. 30] ¶ 21. While he was awaiting disposition of his case, Mr. Weitzman was booked into the Denver jail, known as the Van Cise-Simonet Detention Center. *Id.*  In his initial intake interview with medical, Mr. Weitzman was forthcoming about his known medical issues. Notably, he did not indicate any problems with his eyes. [Doc. 30] ¶ 24.

On or around November 10, 2015, Mr. Weitzman complained to a deputy about a bad rash all over his body, but maintained that it did not itch. [Doc. 30] ¶ 31.  The Deputy agreed that the rash looked serious, and said he would pass along the message. *Id.* The deputy on the pod then told the nurse about Mr. Weitzman's body-wide rash, but the nurse simply refused to see Mr. Weitzman. [Doc. 30] ¶ 32. Instead, the Deputy returned with the message that Mr. Weitzman had to send a kite, which he promptly did. *Id.* When Defendant Marcellina Rosales finally addressed that kite, on or around November 11, 2015, her only proposed treatment plan for Mr. Weitzman's long-lasting,

wide-ranging rash was for him to be evaluated in nearly three weeks, on December 1, 2015. [Doc. 30] ¶ 33.

On or around November 15, 2015, Mr. Weitzman kited to indicate that he was experiencing blurred vision. [Doc. 30] ¶ 34. In the same kite, he reported that his rash had gotten significantly worse, and had continued to spread. *Id.* Defendant Valerie Snyder did not even acknowledge Mr. Weitzman's complaint about his vision in her assessment, dated November 16, 2015. [Doc. 30] ¶ 35. Her assessment notes do confirm that Mr. Weitzman's rash was indeed all over his body. *Id.* Despite the serious complaint that Mr. Weitzman was experiencing blurred vision, Defendant Snyder did nothing to address that issue. [Doc. 30] ¶ 36. In her note on Mr. Weitzman's kite, Defendant Snyder reminded Mr. Weitzman about his appointment on November 19. [Doc. 30] ¶ 37.  However, that appointment was abruptly cancelled without any explanation. [Doc. 30] ¶ 38.

On or around November 23, 2015, Mr. Weitzman had an appointment with Defendant Crum and explained the issue he was having with his eyesight. [Doc. 30] ¶ 39.  Defendant Crum agreed that Mr. Weitzman should see an ophthalmologist. *Id.* Despite the seriousness of vision loss, Defendant Crum told Mr. Weitzman he had to wait a week before contacting a specialist. [Doc. 30] ¶ 41.

After returning from his appointment with Defendant Crum, Mr. Weitzman sent yet another kite in which he plainly stated that he was seeing black spots in one of his eyes. [Doc. 30] ¶ 42.  He also renewed his complaint about his rash, and yet again asserted that it was getting worse. *Id.* The only indication that this kite was ever even seen by medical personnel is Defendant Ann Jacobson's stamped signature in the "triage box" in one corner, where she checked the box designating Mr. Weitzman's kite as "routine" although it was anything but. [Doc. 30] ¶ 43.  As usual, the assessment notes do not even address Mr. Weitzman's dire complaint that he sees "black spots out of 1 eye" and there is no indication that Defendant Jacobson reported or addressed this urgent request for medical attention. *Id.*

Despite months of deliberate indifference from the Denver Health staff, Mr. Weitzman sent yet another kite on or around December 3, 2015. [Doc. 30] ¶ 44. He reported yet again that he was losing vision in one eye, and ended the kite with a starred note reading "real concerned about my vision." *Id.* In his assessment, Defendant Glen McCoy finally acknowledged (perhaps for the first time in writing) Mr. Weitzman's complaints about his vision, writing, "[patient] states that [he] is having problem seeing out of R Eye (sic)." *Id.* In the treatment plan, Defendant McCoy simply noted that Mr. Weitzman had an appointment on December 21, 2015. [Doc. 30] ¶ 45. However, Mr. Weitzman was scheduled to be released on December 12, 2015, a fact which he repeatedly told staff at the jail. *Id.*

On December 9, 2015, Mr. Weitzman sent a kite reporting that he was almost completely blind in his right eye, and that the vision loss was starting in his left. [Doc. 30] ¶ 46. He also mentioned that, although Dr. Crum had advised on November 23, 2015 that they wait one week, the nurses had merely scheduled him for a follow-up appointment with Dr. Crum (not with an ophthalmologist) three weeks later. *Id.*

Despite Mr. Weitzman's serious and well-articulated concerns, Defendant Nurse J. M. wrote in her assessment "[inmate] walking around pod in no apparent distress. Not favoring one eye over the other." She also wrote that "[inmate] states no complaints when asked" which is simply not true. [Doc. 30] ¶ 47. Mr. Weitzman was panicked about his rapidly deteriorating eyesight and Denver Health's apparent unwillingness to do anything about it. *Id.* He tried to get the medical attention he needed through any avenue possible, and certainly would not have told a nurse that he had "no complaints." *Id.* In her treatment plan on the December 9 kite, Defendant Nurse J.M. reiterated the fact that Mr. Weitzman had a doctor's appointment on December 21, 2015, nine days after his release date. [Doc. 30] ¶ 48. Again, Defendant J.M. falsely reported that, when reminded of this appointment, "[inmate] stated that was fine." *Id.* This appointment date was absolutely not fine with

Mr. Weitzman, and he repeatedly tried to inform the medical staff that he was supposed to be released before that date. *Id.*

Desperate to find another avenue by which to be seen by someone who would take his condition seriously, Mr. Weitzman filled out an inmate message form, wherein he explained that "I am literally blind (90%) in my right eye and it got worse today. It's starting to happen in my left eye now (3 days ago). I kited medical but want me to wait for my doc's appt. The doc knows about this but wanted to wait a week for my follow-up appointment. It's been over 2 weeks." [Doc. 30] ¶ 49. He passed this message form to the deputy in his pod. *Id.* Callously, the pod deputy simply wrote "RN wants you to kite! Does not cost to kite. Cost's [sic] to be seen." [Doc. 30] ¶ 50. He then returned Mr. Weitzman's message without delivering it to anyone, despite the seriousness of its content. *Id.*

Mr. Weitzman was released from jail on December 12, 2015 without ever having seen Dr. Crum again, or having seen a specialist. [Doc. 30] ¶ 51. Mr. Weitzman was treated for ocular syphilis with a routine course of antibiotics, but the vision loss he suffered while in the Denver County Jail could not be reversed. [Doc. 30] ¶ 53-55. Due to Defendants deliberate indifference to his serious medical needs while he was in jail, Mr. Weitzman ultimately lost 70% of the vision in his right eye. [Doc. 30] ¶ 57.  His pre-existing nearsightedness has also gotten worse. *Id.*

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 8(a) provides that to state a claim upon which relief can be granted, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The United States Supreme Court has interpreted this requirement as facial plausibility: "a complaint must contain enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1190-91 (10th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausible in this context

5

does not mean "likely to be true." *Robbins v. Okla ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008). Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009). A plaintiff need not establish a prima facie case or include specific factual allegations to state a claim for relief; the plaintiff "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Khalik*, 671 F.3d at 1191 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).

A defendant may assert that the plaintiff has failed to state a claim upon which relief can be granted by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  "There is a strong presumption against dismissal for failure to state a claim under Rule 12(b)(6)."  *Shell v. Am. Family Rights Ass'n, 899 F. Supp. 2d 1035, 1055 (D. Colo. 2012).*  "[G]ranting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cty. of Denver,* 567 F.3d 1169, 1178 (10th Cir. 2009) (citation omitted).  In reviewing a Rule 12(b)(6) motion, the court must accept as true well-pleaded factual allegations in the complaint, viewing these allegations in the light most favorable to the plaintiff, and determine whether they plausibly give rise to an entitlement to relief. *Iqbal,* 556 U.S. at 679; *Kerber v. Qwest Grp. Life Ins. Plan,* 647 F.3d 950, 959 (10th Cir. 2011). In making this determination, the court must consider the complaint in its entirety.  *Kennedy v. Peele,* 552 F.App'x 787, 792 (10th Cir. 2014) (unpublished).

## LEGAL ARGUMENT

### I. The Medical Defendants were deliberately indifferent to Mr. Weitzman's serious medical needs.

The Supreme Court has long held that an inmate's constitutional rights are violated when prison officials are deliberately indifferent to his or her serious medical needs:

> Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs* or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless [sic] of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

*Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (internal quotations omitted) (emphasis added). As explained in more detail below, the Medical Defendants were deliberately indifferent to Mr. Weitzman's serious medical needs, causing him to lose 70% of the vision in his right eye. *Am. Compl.* ¶ 57 [Doc. 30].

"The test for constitutional liability of prison officials involves 'both an objective and a subjective component.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). The objective component is met if the medical need is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The subjective component is met if a prison official "knows of and disregards an excessive risk to [prisoner] health or safety." *Id.* at 837. The circumstances surrounding Mr. Weitzman's vision loss satisfies both components.

### a.  Mr. Weitzman's vision loss was a sufficiently serious medical need.

A serious medical need is one that "that has been diagnosed by a physician as mandating treatment or **one that is so obvious that even a lay person would easily recognize the necessity of a doctor's attention.**" *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (citing *Laaman v. Helgemoe*, 437 F.Supp 269, 311 (D.N.H. 1977)) (emphasis added). Courts have long recognized the seriousness of vision loss. In addressing the issue, the Ninth Circuit Court of Appeals held that "monocular blindness is a serious medical need. Although blindness in one eye is not life-threatening, it is no trifling matter either. It is not a bump or scrape or tummy ache. Monocular

blindness is the loss of the function of an organ." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014). As recently as 2016, the Tenth Circuit held that allegations of "a permanent [vision] loss and considerable pain caused by delay in referral to a medical specialist...are 'sufficiently serious' to satisfy the deliberate indifference objective prong." *Randolph v. Glanz*, 2016 U.S. Dis. LEXIS 126311, at *9-*10 (N.D. Okla. Sep. 16, 2016). *See also Estes v. Fortunato*, 2011 U.S. Dist. LEXIS 105585, at *22 (D. Colo. Aug. 9, 2011) (finding that Plaintiff's allegation of vision loss describes "a medical condition that may be recognized as serious and contains sufficient factual allegations to support the objective component of an Eighth Amendment claim.")

Mr. Weitzman was direct and unambiguous in both his kites and his conversations with staff about his rapidly deteriorating eyesight. [Doc. 30], ¶¶ 30, 34, 39-40, 42, 44, 46, 49. Immediately upon release, he was given the appropriate medical treatment, but was also given the life-altering news that he was 70% blind in his right eye, and that that he could never regain his lost eyesight. [Doc. 30], ¶¶ 52-57. The complaint is rife with facts about Mr. Weitzman's vision loss: as early as November 15, 2015, Mr. Weitzman kited that he was experiencing blurred vision. [Doc. 30], ¶ 34. During an appointment with Dr. Crum, Mr. Weitzman explained, in person, the issue he was having with his eyesight. [Doc. 30], ¶ 39. During that appointment, Defendant Crum acknowledged the seriousness of Mr. Weitzman's condition, recognized that he lacked the expertise to treat Mr. Weitzman's vision loss, and stated that Mr. Weitzman should see a specialist. [Doc. 30] ¶ 39. However, Defendant Crum also recommended that Mr. Weitzman wait a week before even being allowed to schedule an appointment with a specialist, let alone actually seeing said specialist. [Doc. 30], ¶ 40.

Also on November 23, 2015, Mr. Weitzman sent yet another kite in which he plainly stated that he was seeing **black spots** in one of his eyes. [Doc. 30] ¶ 42. On or around December 3, 2015, Mr. Weitzman again kited to report that **he was losing vision in one eye**, and ended the kite with a

starred note reading "**real concerned about my vision**." [Doc. 30] ¶ 44. On or around December 9,

2015, Mr. Weitzman stated, in no uncertain terms, that he was almost completely blind in his right

eye, and that the vision loss was starting in his left. [Doc. 30] ¶ 46.

Furthermore, the Tenth Circuit has held that an "alleged delay in obtaining specialized

medical treatment meets the objective element of the deliberate indifference test." *Oxendine v.*

*Kaplan*, 241 F.3d 1272, 1278 (10th Cir. 2001). In the instant case, the Medical Defendants did not

merely delay in obtaining specialist care for Mr. Weitzman, they never obtained the care at all.  [Doc.

30], ¶¶ 33, 35-38, 43-48.

Mr. Weitzman lost 70% of the vision in one of his eyes as a result of Defendants' deliberate

failure to provide him with prompt medical attention to treat his obvious difficulty seeing (including

blurred vision, black spots in his vision, and total blindness in certain fields of his vision), and their

failure to contact a medical specialist on his behalf. [Doc. 30], ¶¶ 30, 34, 40, 42-44-46, 49, 57-58, 79.

The harm Mr. Weitzman suffered was, therefore, without doubt, sufficiently serious to meet the

objective component.

**b.   The Medical Defendants knew that Mr. Weitzman was going blind, and yet**
**disregarded that excessive risk to his health.**

Mr. Weitzman adequately alleges that each Medical Defendant knew of and disregarded an

excessive risk to his health and safety in violation of his Constitutional rights. [Doc. 30], ¶¶ 33, 35-

38, 43-48. Although the subjective intent prong of the deliberate indifference test is a hurdle that

Plaintiff must clear, *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006), the Tenth Circuit does not

intend it to be an "insurmountable obstacle." *Id*.  Importantly, whether the Denver Health staff,

including Dr. Crum, "had the requisite knowledge of a substantial risk is a question of fact subject to

demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511

U.S. at 842.  Defendants' subjective knowledge of Mr. Weitzman's serious medical needs can be

established by showing either Defendants' (1) conscious disregard of a substantial risk of serious

harm arising from Mr. Weitzman's symptoms, or (2) actual knowledge of Mr. Weitzman's medical

condition and refusal to order further treatment.  *Self*, at 1233.  Numerous facts, as alleged in the

Amended Complaint support both determinations. [Doc. 30], ¶¶ 30, 33-38, 43-48, 70-80. "Although

deliberate indifference is a subjective inquiry, a jury is permitted to infer that a prison official had

actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence,

such as the obviousness of the condition." *Id*.

It is clear from the allegations in the Amended Complaint that any treatment provided by the

Medical Defendants was grossly inadequate, [[Doc. 30], ¶¶ 33,45, 48, and even purposefully

deficient so as to comply with Denver Health's custom, policy, and practice of providing lacking

care. [Doc. 30], ¶¶ 63-69; *see also Hunt v. Uphoff,* 199 F.3d 1220, 1223 (10th Cir. 1999) (reversing

lower court's dismissal of plaintiff's complaint finding that plaintiff's allegations did not "reflect a

'mere disagreement with his medical treatment'" and holding that just because treatment was

prescribed or provided at all did not necessarily mean that plaintiff received treatment for his serious

medical needs.); *Mata v. Saiz*, 427 F.3d 745, 755 – 756 (10th Cir. 2005) (reversing grant of summary

judgment, in case wherein the medical professional neither administered first aid nor summoned

medical assistance despite plaintiff's plea for medical attention in response to plaintiff's complaints

of chest pain, and holding that plaintiff provided evidence that defendant medical professional was in

fact aware plaintiff was suffering from severe chest pains and required medical attention.); *Stilwell v.

Conceco*, No. 99-7090, 2000 U.S. App. LEXIS 8628 (4th Cir. May 2, 2000) (finding that plaintiff

alleged sufficient facts to state a claim for deliberate indifference against defendant doctors who did

not consider plaintiff's complaints to be life threatening and prescribed plaintiff only Tylenol).

The alleged facts raise an inference that the Medical Defendants had knowledge of Mr.

Weitzman's specific need for the attention of a medical specialist due to the seriousness of claims of

declining vision. *See Self*, 439 F.3d at 1232 (holding that a claim for gatekeeper liability is actionable

"where the need for additional treatment or referral to a medical specialist is obvious"); [Doc. 30], ¶¶ 39-40. The Amended Complaint alleges that Nurses McCoy, Snyder, Jacobson, J.M. and Dr. Crum all personally fielded unambiguous complaints from Mr. Weitzman, either in writing or in person, that he was having trouble seeing, and that none of them took reasonable steps to ensure that he received further medical treatment. *See* [Doc. 30], ¶¶ 34-37, 39-49. Defendant Rosales received a complaint that Mr. Weitzman had a serious body-wide rash which was not responding to treatment. *See* [Doc. 30] ¶¶31, 33.  None of the Medical Defendants made any attempt to assess the cause of Mr. Weitzman's vision issues or persistent rash (which would have almost certainly led them to discover that Mr. Weitzman had an infection), take any action to prevent further deterioration, or continue to monitor Mr. Weitzman's condition. [Doc. 30], ¶¶ 40, 43-45.  One nurse, J.M., went so far as to falsely chart that Mr. Weitzman had "no complaints" about his medical condition.  [Doc. 30] ¶¶ 47-48.  Medical Defendants' lack of action and follow-up definitively evinces subjectively, deliberately indifferent care. *See, e.g., Self*, 439 F.3d at 1232 (recognizing that a jury can infer conscious disregard where "a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency").

Additionally, the seriousness of the harm can be an indicator of subjective reasonableness. *See Id.* at 1231. In this case, the harm was obviously serious, as Mr. Weitzman had reported numerous serious symptoms in writing, which the nurses ostensibly read before writing their notes on the bottom portion of each kite, or applying their stamped signature. [Doc. 30], ¶¶ 33, 35-37, 43-45, 47-48. Each Medical Defendant disregarded these obvious signs and Mr. Weitzman was left permanently impaired. *Id.* ¶ 33, 35-38, 43-48, 58.

In *Sparks v. Rittenhouse*, 164 Fed. Appx. 712 (10th Cir. 2006), the Court reversed the lower court's order dismissing a plaintiff-inmate's claim of denial of medical treatment despite having been examined by defendant doctor at least eight times. *Id.* at 713. The court held that plaintiff's allegation that defendant doctor expressed a view that non-incarcerated individuals do not receive the same

level of medical treatment that inmates do supported an inference that the doctor was deliberately indifferent to plaintiff's situation. *Id*. at 716. Similarly, taking the facts as true as alleged in the Amended Complaint, a reasonable inference can be drawn that the medical staff at the Denver County Jail, including the Medical Defendants, were deliberately indifferent to Mr. Weitzman's medical needs because he was a "difficult" inmate (who kited too often or complained too much). Only through the discovery process can this nuanced assessment of the Medical Defendants' subjective intent and knowledge be reliably determined.

The Amended Complaint adequately establishes at the motion to dismiss stage that each Medical Defendant was subjectively, deliberately indifferent to Mr. Weitzman's medical needs. [Doc. 30], ¶¶ 33, 35-38, 43-48.

**II.**   **The Medical Defendants are not entitled to qualified immunity.**

Defendants' assertion of qualified immunity as a basis for their motion to dismiss is accompanied by scant support; likely because the actions of the Medical Defendants in this care are unsupportable. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Once a defendant asserts a qualified immunity defense, a two-part burden shifts to the plaintiff. *See, Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir. 2000); *Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995); *Albright v. Rodriquez*, 51 F.3d 1531, 1534 (10th Cir. 1995). To defeat the Medical Defendants assertion of qualified immunity, Plaintiff must first allege that each Defendant's actions violated a constitutional or statutory right. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This determination in the context of a 12(b)(6) motion requires the Court to determine whether a constitutional violation was pled by accepting all allegations as true and evaluating them in the light most favorable to the Plaintiff. *Kikumura v. Osagie,* 461 F.3d 1269, 1291 (10th Cir. 2006); *see also, Saucier v. Katz*, 533 U.S. 194,

201 (2001). Next, Plaintiff must demonstrate that the right at issue was clearly established at the time

of the Medical Defendants' unlawful conduct. *Harlow*, 457 U.S. at 818. In determining whether the

right was "clearly established," the Court must assess the objective legal reasonableness of the action

at the time of the alleged violation, and ask whether the right was sufficiently clear that a reasonable

individual in the Defendant's position would understand that what she is doing violates that right.

*Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

   **a.   Each Medical Defendant violated Mr. Weitzman's constitutional rights.**

A claim for inadequate medical attention will be successful if the plaintiff shows "deliberate

indifference to serious medical needs." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). As

discussed in more detail above, Plaintiff has shown that the Medical Defendants knew about and

disregarded the excessive risk to Mr. Weitzman's health posed by blurred vision, seeing spots, vision

loss, and a rash that did not respond to treatment.  [Doc. 30], ¶¶ 33, 35-38, 43-48.

   **b.   Mr. Weitzman's right to be free from deliberate indifference to his serious**
       **medical needs was clearly established in November 2015.**

As stated above, Mr. Weitzman has adequately alleged that each Medical Defendant violated

his constitutional rights. The only remaining question is whether that right was clearly established at

the time of the events at issue. "[T]here is little doubt that **deliberate indifference** to an inmate's

serious medical need is a clearly established constitutional right." *Mata v. Saiz,* 427 F.3d 745, 749

(10th Cir. 2005). As stated by the Supreme Court in *Estelle*:

> Elementary principles establish the government's obligation to provide
> medical care for those whom it is punishing by incarceration. An inmate must
> rely on prison authorities to treat his medical needs; if the authorities fail to
> do so, those needs will not be met. In the worst cases, such a failure may
> actually produce physical "torture or a lingering death," . . . the evils of most
> immediate concern to the drafters of the Amendment. . . . The infliction of
> such unnecessary suffering is inconsistent with contemporary standards of
> decency. . . .

*Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (citations omitted). Plaintiff is not required to show that the Medical Defendants' were deliberately indifferent to his neurosyphilis *specifically*, but rather that they were on notice of a serious medical need (i.e. progressive vision loss) and yet did nothing. *See e.g. Mata*, 427 F.3d, at 755-756 (reversing the grant of summary judgment to a nurse who was on notice, not of Plaintiff's underlying medical condition, but simply of the sufficiently serious symptoms (chest pains)).

Further, "[i]t has been clearly established in this circuit since at least 2006 that a deliberate indifference claim will arise when a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency." *Al-Turki v. Robinson*, 762 F.3d 1188,1194 (10th Cir. 2014) (internal quotation marks omitted); *Mata*, 427 F.3d at 755-59 (holding that the evidence was sufficient to support a deliberate indifference claim when an inmate presented symptoms of severe chest pain to a prison nurse, and the nurse, knowing that such symptoms were a sign of a potentially serious health risk, failed to refer the inmate to a physician). The Medical Defendants were on notice that their failure to provide any meaningful care to Mr. Weitzman, despite obvious signs of serious medical needs, violated his clearly established rights. [Doc. 30], ¶¶ 63-69.

Additionally, it was clearly established that when the Medical Defendants—with the actual knowledge that Mr. Weitzman was suffering blurred vision, and seeing black spots—were then confronted with Mr. Weitzman's report that he was "losing vision in one eye", and therefore had the obligation to provide Mr. Weitzman access to necessary medical personnel, including a treating physician. The Medical Defendants were on fair notice that failing to provide such access would be sufficient to show a constitutional violation. *See, e.g., Estelle*, 429 U.S. at 104-05 (deliberate indifference may be found when prison guards intentionally deny or delay an inmate access to medical care); *Sealock*, 218 F.3d at 1210 (holding prison guard could be liable for deliberate

indifference when he was told that plaintiff might be having a heart attack and refused to transport him to a doctor).

The Medical Defendants' reliance on the Fourth Circuit's decision in *Johnson v. Quinones*, 145 F.3d 164 (4th Cir. 1998) is misplaced.  In that case, Plaintiff presented to the doctor at the Keen Mountain Correctional Facility with a host of maladies, including blurred vision.  After he was released, he subsequently went blind in both eyes due to an undiagnosed pituitary tumor.  He then sued the doctor at the correctional facility, and one of the specialists who treated him.  The Fourth Circuit affirmed the grant of summary judgment in favor of the doctors. Medical Defendants claim that this case is "the most analogous" [Doc. 35] p. 11.  However, not only is the *Johnson* decision not binding on this court, the correctional doctor in that case consulted with, and referred plaintiff to, at least three specialists (a dermatologist, an ophthalmologist, and an optometrist) over the course of plaintiff's incarceration. *Johnson.* 145 F.3d at 165-166.  The court in that case did, however, agree that the plaintiff's pituitary tumor was a sufficiently serious medical need, thereby satisfying the objective component of the deliberate indifference test, despite the fact that the tumor itself went undiagnosed while plaintiff was incarcerated. In finding that plaintiff did not satisfy the subjective prong of the deliberate indifference analysis, the court makes much of the fact that the defendant consulted several specialists. *Id.* at 168-169. In the case at bar, the Medical Defendants made no effort to have Mr. Weitzman treated by even one specialist, let alone three.

As detailed above, each Medical Defendant failed to provide Mr. Weitzman with adequate care to his basic, and emergent, medical needs. *See Ramos*, 639 F.2d at 574 (stating that in order to comply with constitutional guarantees, a state must make "available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates... [and t]his includes medical treatment for inmates' physical ills, dental care, and psychological or psychiatric care."); [Doc. 30], ¶¶ 33, 35-38, 43-48. The Medical Defendants failure to provide Mr. Weitzman with further medical treatment, including physician assistance, after receiving repeated,

detailed reports about the rapid decline of Mr. Weitzman's eyesight, implicates a clearly established right to receive adequate "gatekeeping" treatment in order to obtain basic medical care. [Doc. 30], ¶¶ 30, 34, 39-40, 42, 44, 46, 49. *See Sealock*, 218 F.3d at 1211(holding prison officials are deliberately indifferent when they fail to perform "gatekeeping" roles, thereby preventing serious medical needs from being met). The Amended Complaint adequately alleges that the Medical Defendants violated Mr. Weitzman's clearly established rights.

### III. Plaintiff has sufficiently pled the necessary elements of a municipal liability claim against Denver Health in his Amended Complaint.

A municipality can be held liable pursuant to §1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The imposition of liability under *Monell* requires that Plaintiff show 1) that a municipal employee violated his constitutional rights, and 2) that a municipal custom, policy or practice of was the moving force behind that violation. *Myers v. Okla. Cnty. Bd. of Cnty. Commr's*, 151 F.3d 1313, 1316 (10th Cir. 1998). A policy or custom can be established in many ways, including demonstrating the existence of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation and quotations omitted).

Defendant Denver Health argues that Plaintiff received "constitutionally adequate" care for his complaints of a rash and vision loss. [Doc. 34], p. 15. However, the facts in the Amended

Complaint, which must be construed in the light most favorable to the plaintiff specifically detail all the ways in which this is simply not true.

### a. Defendants were deliberately indifferent to Mr. Weitzman's serious medical needs and therefore violated his constitutional rights under the Eighth Amendment.

It is well established that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). As explained more fully above, the Medical Defendants were deliberately indifferent to Mr. Weitzman's serious medical needs, and therefore have violated his constitutional rights and will be found liable under §1983. Taking the allegations in the light most favorable to Plaintiff and drawing every reasonable inference therefrom, as the Court must according to well-established law, Plaintiff has alleged facts sufficient to support his claim that his constitutional rights were violated.

### b. Denver Health's custom, policy or practice was the moving force behind Mr. Weitzman's injury.

Plaintiff alleges that the uniform deliberately indifferent response by multiple caregivers to Mr. Weitzman's deteriorating and permanently debilitating condition evidences a pattern of conduct and deliberately indifferent training and supervision by Defendant Denver Health, an inference to which Plaintiff is entitled at this procedural stage. [Doc. 30], ¶¶ 63-64, 83-87. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1319 (10th Cir. 2002).

Moreover, the Amended Complaint specifically describes numerous cases that occurred before the *Weitzman* incident when the Defendant Denver Health engaged in these illegal practices, such as improperly training staff to ignore obvious signs and symptoms warranting emergency medical care. [Doc. 30], ¶¶ 65-69. These cases unequivocally put Defendant Denver Health on notice that its medical practices were unconstitutional long before they cost Mr. Weitzman his sight.

Defendants' contention that prior recent cases provide insufficient notice because they are not factually identical to Mr. Weitzman's case misconstrues § 1983 case law. Plaintiff sufficiently alleges a pattern of knowingly refusing to treat serious emergent medical conditions – conditions obvious to lay people but repeatedly ignored by medical staff. [Doc. 30], ¶¶ 30, 33-40, 42-49. The particular type of emergency at issue, whether it be a mental health crisis or withdrawal or seizure disorder, does not need to be exactly the same as the condition addressed in prior precedent to state a *Monell* claim. *Starstead v. City of Superior*, 533 F. Supp. 1365 (W.D. Wis. 1982) is instructive. There, the Court rejected Defendant's argument that evidence of past incidents did not reflect the type of persistent practice necessary to predicate entity liability on a "custom" theory, holding:

> Plaintiffs need not point to a specific, articulated municipal policy in order to withstand this motion to dismiss. . .where the plaintiff alleges a pattern or series of incidents of unconstitutional conduct, then the courts have found an allegation of policy sufficient to withstand a dismissal motion.

*Id.* at 1369-70 (Internal citations omitted).

Thus, the Amended Complaint's series of particularized allegations describing Defendant Denver Health's persistent and widespread practice of deliberate indifference to the constitutional rights of inmates give Defendant Denver Health "fair notice" of the grounds for which they are being sued. [Doc. 30], ¶¶ 63-69. *See Lynch v. Barrett*, 2012 U.S. Dist. LEXIS 72250, at *18-21 (D. Colo. May 24, 2012) (Jackson, J.), *rev'd in part on other grounds*, 703 F.3d 1153, 1164 (10th Cir. 2013).

### i. Defendant Denver Health is also liable under a theory of single incident liability.

Even assuming, *arguendo*, that the Medical Defendants' wrongdoing constitutes a "single" incident (it does not because multiple Defendants over the course of roughly a month responded with deliberate indifference to Mr. Weitzman's serious medical needs, again and again [Doc. 30], ¶¶ 33, 35-38, 43-48), Defendant Denver Health's liability is still properly pled because

> a showing of specific incidents which establish a pattern of constitutional violations is not necessary to put the City on notice that its training program is inadequate. Rather, evidence of a single violation of federal rights, accompanied by a showing

> that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability.

*Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997); *see also Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998) ("[D]eliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction.") (internal citation omitted), *superseded by statute on other grounds*; 42 U.S.C. § 1997e. The individual Defendants' sustained and willful failure to even properly assess Mr. Weitzman's increasingly severe medical condition, despite knowing Mr. Weitzman's vision continued to decline, shows Defendants' deliberate indifference. [Doc. 30], ¶¶ 33, 35-40, 43-48. The injuries Mr. Weitzman ultimately suffered were a "plainly obvious consequence" of inadequate training and supervision by Defendants Denver Health, Dr. Crum, and Nurse Doe 1 (the "Supervisor Defendants") regarding inmate complaints about quickly developing medical symptoms. [Doc. 30], ¶¶ 81-92.  Medical emergencies which are self-reported by inmates are, after all, extremely common medical issues in jail settings which can very quickly turn deadly if not properly evaluated and treated – and Defendants Denver Health and Crum knew this long before the *Weitzman* incident. *See Barney*, 143 F.3d at 1307-08.

## ii. There is no heightened pleading requirement for training.

The United States Supreme Court recently, and explicitly, held that the normal Rule 8 pleading standard should apply to civil rights claims. *See Johnson v. City of Shelby*, 135 S.Ct. 346, 347 (2014) (per curiam) (quoting *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993) for the proposition that "a federal court may not apply a standard 'more stringent than the usual pleading requirements of Rule 8(a)' in 'civil rights cases alleging municipal liability'"). The pleading requirements require that Plaintiff plead "only enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. In this context "plausible" does not mean "likely to be true," but is, instead, a nudge beyond "conceivable." *See*

*Robbins*, 519 F.3d at 1247; *see also* Standard of Review, *supra*. The Medical Defendants' attempts to impose a heightened pleading standard to Plaintiff's *Monell* claims therefore fail. It is not necessary at the pleading stage for Plaintiff to identify all the particular deficiencies in the Defendants' Denver Health and Supervisors training and supervision. Cf. *Walker*, 2012 U.S. Dist. LEXIS 74386, at *14.

Moreover, it is exceedingly likely that all individual medical Defendants will testify that they acted precisely as Defendant Denver Health and the Supervisor Defendants trained them to act, and conducted themselves in accordance with and pursuant to the customs and practices of Defendant Denver Health at all relevant times. Such binding admissions will create a <u>jury question</u> as to the Defendant Denver Health's liability and, therefore, undoubtedly militate against dismissing them as defendants at this very early stage in the case, before any Defendants have even been deposed. *See Moore*, 2014 U.S. Dist. LEXIS 72452, at *27 ("[I]f Defendant Police Officers testify that they acted in accordance with their training and it is found that they committed constitutional violations, the reasonable inference is that, had the City implemented a different training policy on the use of force, Mr. Moore would not have been subjected to the amount force used in this case."); *Ortega v. City & Cnty. of Denver,* 944 F. Supp. 2d 1033, 1039 (D. Colo. 2013) (Martinez, J.). As such, dismissal of any of Plaintiff's claims against the Medical Defendants is unwarranted.

CONCLUSION

Wherefore, Plaintiff asks that this Court deny Defendants' Denver Health, Crum, Snyder, Rosales, Jacobson, and McCoy Motion to Dismiss Amended Complaint for Failure to state a claim in its entirety.

Respectfully submitted this 25th day of May, 2018.

.

*s/ Eleanor K. Wedum*
David Lane
Eleanor K. Wedum
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
dlane@kln-law.com
ewedum@kln-law.com

## **CERTIFICATE OF SERVICE**

I certify that on this 25th day of May 2018 I filed this **PLAINTIFF'S RESPONSE TO MEDICAL DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM** via CM/ECF, and CM/ECF will generate a Notice of Electronic Filing to the following:

Scott Nixon
Nixon Shefrin Hensen Ogburn
5619 DTC Parkway, Suite 1200
Greenwood Village, CO 80111
snixon@nixonshefrin.com

Conor Farley
Assistant City Attorney
City and County of Denver
201 W Colfax Avenue, Section 1108
Denver, CO  80202
conor.farley@denvergov.org

*s/ Charlotte Bocquin Scull*
Paralegal