IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-02703-KLM

TODD WEITZMAN,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER,
DENVER HEALTH AND HOSPITAL AUTHORITY, d/b/a Denver Health Medical Center,
PETER CRUM, M.D., in his individual and official capacities,
VALERIE SNYDER, L.P.N., in her individual capacity,
MARCELLINA ROSALES, L.P.N., in her individual capacity,
ANN JACOBSON, L.P.N., in her individual capacity,
GLEN McCOY, L.P.N., in his individual capacity,
JOSHUA MCFERRIN, L.P.N., in his individual capacity, and
DENVER HEALTH MEDICAL CENTER JANE DOE 1, in her individual capacity,

     Defendants.
_____

## ORDER
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on the following motions on the (1) **Motion to Dismiss Amended Complaint for Failure to State a Claim** [#34],[1] filed by Defendants Denver Health and Hospital Authority ("Denver Health"), Peter Crum, M.D., ("Crum"), Valerie Snyder, L.P.N. ("Snyder"), Marcellina Rosales, L.P.N., ("Rosales"), Ann Jacobson, L.P.N. ("Jacobson"), and Glen McCoy ("McCoy")[2] (the "Medical Defendants' Motion"); and (2) **Motion to Dismiss Plaintiff's Amended Complaint** [#35], filed by

---

[1] "[#34]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

[2] Defendant McCoy joined the Medical Defendants' Motion [#34] on May 4, 2018. *See Notice of Joinder* [#45].

- 1 -

Defendant City and County of Denver ("Denver") (the "Denver Motion"). Plaintiff filed Responses [#47, #48] in opposition to the Motions, and Defendants filed Replies [#51, #52]. The Court has reviewed the Motions, the Responses, the Replies, the entire case file, and the applicable law, and is sufficiently advised in the premises. Based on the following, the Motions [#34, #35] are **GRANTED**.[3]

## I. Background

Plaintiff Todd Weitzman initiated this lawsuit pursuant to 42 U.S.C. § 1983 on November 13, 2017. *Compl.* [#1]. Plaintiff filed an Amended Complaint and Jury Demand [#30] (the "Amended Complaint") on March 22, 2018, which is the operative pleading in this case. Plaintiff's claims arise from his pre-trial detainment at the Van Cise-Simonet Detention Center ("VCSDC") between September of 2015 and December 12, 2015. *Am. Compl.* [#30] ¶ 21-51. Plaintiff generally alleges that medical staff at VCSDC failed to address his complaints of a skin rash and vision loss which turned out to be symptoms of ocular syphilis with which Plaintiff was diagnosed after his release. *See generally id.* Plaintiff brings his claims against Denver, Denver Health, and individual employees of Denver Health which include Defendants Crum, Snyder, Rosales, Jacobson, McCoy, Joshua McFerrin ("McFerrin"),[4] and Denver Health Medical Center Jane Doe 1 ("Jane Doe"). *See generally id.*

---

[3] This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties. *See* [#33].

[4] The Amended Complaint names "J.M. L.P.N." as a Doe defendant. *Am. Compl.* [#30] at 1. After the Amended Complaint was filed, Plaintiff identified this individual as Joshua McFerrin, L.P.N. *See Minute Order* [#65]. Defendant McFerrin waived service on February 13, 2019. *Waiver of Service* [#64]. Defendant McFerrin's response to the Amended Complaint is presently due on April 15, 2019, and he has not otherwise entered an appearance in this case. *Id.*

Plaintiff alleges the following facts as the basis for his claims.[5] In September 2015, Plaintiff was arrested and charged with a misdemeanor. *Am. Compl.* [#30] ¶ 21. While awaiting disposition of his case, Plaintiff was booked into VCSDC. *Id.* During his initial intake interview with VCSDC medical staff, Plaintiff disclosed his known medical issues but did not indicate any problems with his eyes. *Id.* ¶ 24. Shortly after being admitted at VCSDC, Plaintiff began experiencing medical and psychological issues. *Id.* ¶ 25. Plaintiff was directed to submit a written notice, known as a "kite," to advise medical staff of these issues. *Id.* Plaintiff began sending many kites to the medical staff for his various medical issues which included difficulties getting medication, pain for preexisting conditions like ulcerative colitis, back and foot pain, and night terrors. *Id.* ¶ 26. Approximately two months into his detention, Plaintiff was moved into a segregated housing unit for his own protection and because his night terrors had been disturbing other inmates. *Id.* ¶ 27. Plaintiff states that, after the move, he continued to have issues getting his medication in a timely manner and in the correct doses. *Id.* ¶ 28. Because Plaintiff's kites failed to resolve these issues, Plaintiff was forced to file a grievance against one of the nurses at VCSDC. *Id.* ¶ 28-29. Plaintiff alleges that, after this grievance was filed, a pattern began where many of his requests for medical attention were "flatly ignored or brushed off," and his attempts to schedule a doctor's appointment became very difficult. *Id.* ¶ 29.

On or around November 5, 2015, Plaintiff had an appointment with Defendant Crum during which they discussed the issues Plaintiff was experiencing with his ulcerative colitis, back pain, and pain from a poorly healed broken foot. *Id.* ¶ 30. Subsequently, Plaintiff was scheduled for a follow-up appointment on November 19, 2015. *Id.*

---

[5] All well-pled facts from the complaint are accepted as true and viewed in the light most favorable to Plaintiff. *See Barnes v. Harris*, 783 F.3d 1185, 1191-92 (10th Cir. 2015).

On or about November 10, 2015, Plaintiff complained of a bad rash covering his body to a deputy who agreed that the rash "looked serious." *Id.* ¶ 31. The deputy notified Plaintiff that he would have to send a kite to seek attention for the rash, which Plaintiff promptly did. *Id.* ¶ 32. According to Plaintiff, this kite was addressed by Defendant Rosales on or around November 11, 2015. *Id.* ¶ 33. Defendant Rosales' only proposed treatment plan for Plaintiff's rash was for him to be evaluated in approximately three weeks, on December 1, 2015. *Id.* ¶ 33.

On or around November 15, 2015, Plaintiff submitted another kite in which he indicated that he was beginning to experience blurred vision and that his rash was getting worse and spreading. *Id.* ¶ 34. This kite was addressed by Defendant Snyder on November 16, 2015, who provided Plaintiff with a note of her assessment. *Id.* ¶ 35. Plaintiff states that Defendant Snyder's assessment confirmed that Plaintiff's rash had spread "all over his body" and that he had been using a cream for his rash since November 3, 2015, without improvement. *Id.* ¶ 35. With regard to his blurred vision, however, Plaintiff avers that Defendant Snyder failed to even acknowledge or address this issue. *Id.* ¶ 36. Plaintiff further states that Defendant Snyder reminded Plaintiff about his November 19, 2015 follow-up appointment with Defendant Crum. *Id.* ¶ 37.

The November 19, 2015 follow-up appointment with Defendant Crum was "abruptly cancelled without explanation" on an unspecified date. *Id.* ¶ 38. This appointment was rescheduled on November 23, 2015. *Id.* ¶ 39. During Plaintiff's follow-up appointment, Plaintiff explained the issues he was having with his eyesight. *Id.* ¶ 39. Defendant Crum agreed that Plaintiff should see an ophthalmologist but decided that they should wait a week before contacting such a specialist. *Id.* Plaintiff "was very concerned

about having to wait a week," but decided to trust and defer to Defendant Crum's medical judgment. *Id.* ¶ 41.

After returning from this appointment, Plaintiff sent another medical kite which indicated that he was seeing black spots in one of his eyes and that his rash was continuing to get worse. *Id.* ¶ 42. Plaintiff states: "the only indication that this kite was ever even seen by medical personnel is Defendant Ann Jacobson's stamped signature in the 'triage box' in one corner, where she checked the box designating [Plaintiff's] kite as 'routine' although it should have been anything but." *Id.* ¶ 43. Plaintiff further alleges that the assessment notes did not address his complaint about seeing black spots in one of his eyes and that there was no indication that Defendant Jacobson reported or addressed this request for medical attention. *Id.*

On or around December 3, 2015, Plaintiff sent another medical kite to report that he was losing vision in one eye and that he was really concerned about his vision. *Id.* ¶ 44. Defendant McCoy acknowledged Plaintiff's complaint about his vision by writing, "[patient] states that [he] is having problem seeing out of R Eye (sic)." *Id.* Defendant McCoy prepared a treatment plan for Plaintiff, scheduling an appointment for December 12, 2015. *Id.* ¶ 45. However, Plaintiff was scheduled to be released on December 12, 2015, "a fact which he repeatedly told medical staff at the jail." *Id.*

Plaintiff submitted his final kite on December 9, 2015, in which he indicated that he was almost completely blind in his right eye and that he was beginning to lose his vision in his left eye. *Id.* ¶ 46. He also noted in the kite that, although Defendant Crum had advised on November 23, 2015,[6] that they wait one week to contact an ophthalmologist,

---

[6] The Amended Complaint states that the final kite referred to November 13, 2015, as the date on which Defendant Crum advised Plaintiff of the one-week wait to contact a specialist.

nurses had scheduled Plaintiff for a follow-up appointment three weeks later.  *Id.* ¶ 46.

Plaintiff alleges that, despite the issues raised in his kite, Defendant McFerrin wrote the

following in his assessment: "[inmate] walking around pod in no apparent distress.  Not

favoring one eye over the other."  *Id.* ¶ 47.  Plaintiff further alleges that Defendant

McFerrin's assessment stated that "[inmate] states no complaints when asked" which,

according to Plaintiff, was false given that Plaintiff "was panicked about his rapidly

deteriorating eyesight and Denver Health's apparent unwillingness to do anything about

it."  *Id.* ¶ 47.  Additionally, Plaintiff avers that Defendant McFerrin reiterated the fact that

Plaintiff had a doctor's appointment on December 21, 2015, nine days after his scheduled

release date. *Id.* ¶ 48.  According to Plaintiff, Defendant McFerrin falsely reported that

Plaintiff stated this date was "fine."  *Id.*

On an unspecified date shortly thereafter, Plaintiff gave an inmate message form

to an unidentified deputy which indicated that Plaintiff was 90% blind in his right eye and

that he was not receiving the treatment he was told he would receive.  *Id.* ¶ 49.  Plaintiff

alleges that this deputy "[c]allously . . . wrote [back] 'RN wants you to kite!  Does not cost

to kite.  Cost's [sic] to be seen" and returned the message without delivering it to medical

staff.  *Id.* ¶ 50.  No additional facts are alleged with respect to this incident.

On December 12, 2015, Plaintiff was released from VCSDC without ever having

seen Defendant Crum again or having seen a specialist.  *Id.* ¶ 51.  Soon after his release,

Plaintiff's personal doctor referred him to a specialist at the Denver Retina Center who

---

*Am. Compl.* [#30] ¶ 46.  However, as Defendant Denver notes, there is no allegation in the Amended Complaint of a November 13, 2015 meeting or appointment with Defendant Crum. *Denver Motion* [#35] at 5 n.1.  In his Reply, Plaintiff concedes that this was a typographical error and that the date referred to in this allegation should have been November 23, 2015.  *Reply* [#47] at 4 n.1.

immediately diagnosed Plaintiff with ocular syphilis. *Id.* ¶¶ 52-53. Plaintiff's diagnosis was confirmed and he was admitted to Rose Medical Center for two weeks of aggressive antibiotic treatment. *Id.* ¶ 54. Although the antibiotic treatment stopped the progress of the infection and the deterioration of Plaintiff's eyesight, he states that his previous vision loss could not be reversed. *Id.* ¶ 55. Ultimately, Plaintiff was diagnosed with three conditions, all of which were caused by the ocular syphilis: (1) pseudopapilledema of the optic disc of his right eye; (2) toxic maculopathy in his right eye; and (3) lattice degeneration of the retina in his left eye. *Id.* ¶ 56.

Plaintiff alleges that he has lost 70% of the vision in his right eye and that his pre-existing nearsightedness has gotten worse because of Defendants' deliberate indifference to his serious medical needs. *Id.* ¶ 57. Plaintiff believes that, if he had been allowed to see a specialist in a timely manner, his eyesight could have been saved. *Id.* ¶ 58. Plaintiff further states that, because of this incident, he continues to require intensive medical treatment, his ability to work has been limited, and that he suffers from deep depression. *Id.* ¶¶ 59-61.

Plaintiff asserts three claims for relief: (1) a Fourteenth Amendment Claim for failure to provide medical care and treatment against all the individual Defendants (Claim One); (2) a § 1983 municipal liability claim for failure to train and supervise against Defendants Denver and Denver Health (Claim Two); and (3) a § 1983 claim for supervisory liability for failure to train and supervise against Defendants Crum and Jane Doe (Claim Three). *Am. Compl.* [#30] ¶¶ 70-95.

The Medical Defendants' Motion [#34] seeks to dismiss (1) Plaintiff's first claim against Defendants Crum, Snyder, Rosales, Jacobson, and McCoy; (2) Plaintiff's second

and only claim against Defendant Denver Health; and (3) Plaintiff's third claim against Defendant Crum.[7]  The Denver Motion [#35] seeks to dismiss Plaintiff's second and only claim against Defendant Denver.

## II.  Standard of Review

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed. R. Civ. P. 12(b)(6) (stating that a complaint may be dismissed for "failure to state a claim upon which relief can be granted").  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted).  To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain enough allegations of fact to state a claim for relief that is plausible on its face."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations." (quoting *Twombly*, 550 U.S. at 570)).

---

[7]  The Medical Defendants' Motion appears to also seek dismissal of all claims against Defendants McFerrin and Jane Doe.  [#34] at 1 n.1 ("The arguments and positions taken in this motion support dismissal of all claims against them as well.").  However, Defendant McFerrin's response to the Amended Complaint remains pending and counsel has not yet entered an appearance on his behalf.  Defendant Jane Doe remains unidentified and is not yet a proper party to the case.  For these reasons, the Court does not construe the Medical Defendants' Motion [#34] as seeking to dismiss the claims against Defendants McFerrin and Jane Doe, and does not consider Plaintiff's claims with respect to these Defendants.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (brackets in original; internal quotation marks omitted).

To survive a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a factual allegation has been stated, "but it has not show[n] [ ] that the pleader is entitled to relief," as required by Fed. R. Civ. P. 8(a). *Iqbal*, 556 U.S. at 679 (second brackets added; citation and internal quotation marks omitted).

### III. Analysis

### A. Defendant Crum (Official Capacity)

As an initial matter, the Court notes that "[a]n action against a person in his official capacity is, in reality, an action against the government entity for whom the person works." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998). Thus, "where a suit contains both entity and official capacity claims, the only defendant is the entity." *Doe v. Douglas Cnty. Sch. Dist.*, 775 F. Supp. 1414, 1416 (D. Colo. 1991). "Naming either is sufficient. Naming both is redundant." *Stump v. Gates*, 777 F. Supp. 808, 816 n.3 (D. Colo. 1991).

Here, Plaintiff has named Defendant Crum in his individual and official capacities as an employee of Denver Health. *See Am. Compl.* [#30]. Defendant Crum is named in Plaintiff's claim for Fourteenth Amendment deliberate indifference (Claim One) and Plaintiff's claim for § 1983 supervisory liability (Claim Three). Plaintiff's § 1983 claim for municipal liability (Claim Two) is asserted only against Defendants Denver Health and Denver. Accordingly, the Court construes Claims One and Two as being asserted against Defendant Crum in his individual capacity only. To the extent that Plaintiff names Defendant Crum in his official capacity regarding either claim, the Court finds that doing so would be duplicative of Claim Two against Defendant Denver Health. *See Atwell v. Gabow*, Civ. No. 07-cv-2063-JLK, 2008 U.S. Dist. LEXIS 31861, at *18-19 (D. Colo. March 31, 2008) ("claims against [the individual defendants] in their 'official capacities' are claims against Denver Health and need not be separately stated"); *Drake v. City and County of Denver*, 953 F. Supp. 1150 (D. Colo. 1997) (a suit against a governmental entity employee in his "official capacity" is the same as a suit against the entity, and the naming of both as defendants is in a lawsuit under § 1983 is redundant).

## B. Claim One: Fourteenth Amendment Failure to Provide Medical Care and Treatment Claim

In Claim One, Plaintiff alleges that Defendants Crum, Snyder, Rosales, Jacobson, McCoy, McFerrin, and Jane Doe, in their individual capacities, violated Plaintiff's Fourteenth Amendment right to be free from deliberate indifference to his known serious medical needs. *Am. Compl.* [#30] ¶ 73, 77. Plaintiff generally asserts that "[e]ach individual Defendant knew or should have known that deliberately disregarding Plaintiff's repeated, unambiguous assertions that he was losing his vision posed a substantial risk of serious harm to Plaintiff's safety; yet Defendants' deliberately disregarded that obvious,

substantial risk, and failed to take reasonable measures to protect Plaintiff from that risk."
*Id.* ¶ 74.   The Medical Defendants, consisting of Defendants Crum, Snyder, Rosales, Jacobson, and McCoy, argue that: (1) Plaintiff fails to adequately allege a cause of action for deliberate indifference; and (2) they are entitled to qualified immunity on Plaintiff's Fourteenth Amendment deliberate indifference claim.   *Medical Defendants' Motion* [#34] at 5-11.

The doctrine of qualified immunity "shields government officials performing discretionary functions from liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Boles v. Neet*, 486 F.3d 1177, 180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   The Court's analysis of qualified immunity in the context of a Rule 12(b)(6) motion involves two inquiries.   The Court must determine whether the alleged facts taken in the light most favorable to the plaintiff sufficiently allege a constitutional violation.   *Saucier v. Katz*, 533 U.S. 194, 201 (2001).   The Court must also consider whether the plaintiff has shown that "the constitutional right was clearly established at the time of the alleged unlawful activity."   *Swanson v. Town of Mountain View, Colo.*, 577 F.3d 1196, 1199 (10th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).   The Court may assess these inquiries in either order.   *Pearson*, 555 U.S. at 236.

The Tenth Circuit has stated that a pretrial detainee's Fourteenth Amendment deliberate indifference claim of inadequate medical care should be evaluated pursuant to the standards set by the United States Supreme Court in *Estelle v. Gamble*, 429 U.S. 97 (1976), which concerned a convicted prisoner's Eighth Amendment deliberate

indifference claim. *Blackmon v. Sutton*, 734 F.3d 1237, 1244 (10th Cir. 2013) (stating that pretrial detainees are owed "at least the same standard of care prison officials owe convicted inmates"); *see Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018) ("Pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment. In determining whether [pretrial detainee's] rights were violated, however, we apply an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983." (quoting *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999)). Because detainees "must rely on prison authorities to treat [their] medical needs," the Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 103-04 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). The test for deliberate indifference is both objective and subjective, in that a detainee must establish that: (1) he was deprived of a medical need that is, objectively, "sufficiently serious," and (2) that the defendant subjectively knew of and disregarded "an excessive risk to [the detainee's] health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).[8]

### 1.    Objective Prong: Sufficiently Serious Condition

---

[8] The Tenth Circuit Court of Appeals, in a recent, unpublished opinion, has noted that circuit courts "are split on whether [*Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015),] alters the standard for conditions of confinement and inadequate medical care claims brought by pretrial detainees," with the Second, Seventh, and Ninth Circuits saying it has done so and with the Fifth, Eighth, and Eleventh Circuits saying it has not done so and that *Kingsley* applies only to excessive force claims. *Estate of Vallina v. Cty. of Teller Sheriff's Office*, __ F. App'x __, __, No. 17-1361, 2018 WL 6331595, at *2 (10th Cir. Dec. 4, 2018). The Tenth Circuit has not yet directly determined this issue. *See id.* However, given that the parties have not raised this issue, and the Tenth Circuit's last published statement on the appropriate test indicates that the standard has not changed at this time, *see Perry*, 892 F.3d at 1121, the Court proceeds on the basis that the Fourteenth and Eighth Amendment standards are identical for purposes of Plaintiff's claims. *See Estate of Vallina*, 2018 WL 6331595, at *3.

With respect to the objective prong, the Court considers whether Plaintiff's harm suffered "rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause" of the Eighth Amendment. *Mata v. Saiz*, 427 F.3d 745, 752-53 (10th Cir. 2005). A medical need is "sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 751 (citation and internal quotation marks omitted). Further, "it is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely 'the symptoms presented at the time the prison employee had contact with the prisoner.'" *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Mata*, 427 F.3d at 752–53).

The Medical Defendants argue that "Plaintiff's allegations do not satisfy the objective component of deliberate indifference because he received prompt assessments and treatments based on his alleged complaints." *Medical Defendants' Motion* [#34] at 7. However, the Court finds that this argument does not challenge the objective seriousness of Plaintiff's medical condition but, instead, raises an issue regarding the subjective prong of the deliberate indifference analysis. *See Mathison v. Wilson*, No. 14-cv-03345-RM-STV, 2017 WL 4221396, at *6 (D. Colo. Feb. 28, 2017), *report and recommendation adopted*, 2017 WL 4227570 (D. Colo. May 10, 2017), *aff'd*, 719 F. App'x 806 (10th Cir. 2017) (noting the issue of whether plaintiff had a sufficiently serious medical condition is separate from the inquiry into the adequacy of the treatment provided for that condition).

Plaintiff alleges that he was ultimately diagnosed with ocular syphilis which caused him to lose 70% of the vision in his right eye. *Am. Compl.* [#30] ¶¶ 53, 56, 57. This District has held held that a loss of vision allegedly due to a delay in treatment is sufficiently serious under the Eighth Amendment. *Estes v. Fortunato*, No. 10-cv-01478-REB-CBS, 2011 WL 4369124, at *8 (D. Colo. Aug. 9, 2011), *report and recommendation adopted*, 2011 WL 4369120 (D. Colo. Sept. 19, 2011) (finding loss of vision "sufficiently serious" for purposes of the objective prong (collecting cases)); *see also Randolph v. Glanz*, 2016 U.S. Dist. LEXIS 126311, *9-10 (finding plaintiff's allegation that he became 85% blind in his left eye was "sufficiently serious" to satisfy the deliberate indifference objective prong). Accordingly, with respect to each of the individual Medical Defendants below, the Court finds that Plaintiff alleges a sufficiently serious medical condition for the purpose of his medical indifference claim.

### 2. Subjective Prong: Knowledge and Disregard of Excessive Risk

The subjective component of the deliberate indifference test "requires a plaintiff to demonstrate that officials acted with a 'sufficiently culpable state of mind.'" *Vega v. Davis*, 673 Fed. App'x. 885, 890 (10th Cir. 2016) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Further, "a prison official cannot be liable unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (internal quotation marks omitted). Importantly, "it is obduracy and wantonness, not inadvertence or error in good faith," that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause. *Whitley v. Albers*, 475 U.S. 312,

319 (1986).  Additionally, a medical professional can be liable under the deliberate indifference standard if he "knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that he may also be liable for deliberate indifference from denying access to medical care." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).  In order to "establish gatekeeper liability, a plaintiff must still allege that the need for medical care was obvious to the prison official."  *Estate of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1227 (D. Colo. 2016).

Here, the Medical Defendants argue that Plaintiff's allegations fail to satisfy the subjective component with respect to them because there are no allegations that Defendant Crum or the nursing staff "ever actually knew or even suspected that Plaintiff had syphilis or ocular syphilis, or any other condition requiring more immediate treatment than was provided."  *Medical Defendants' Motion* [#34] at 8.  The Medical Defendants further assert that "Plaintiff alleges no facts suggesting that [Defendant] Crum or the nursing staff acted with actual malice, or were aware of, and disregarded, a substantial risk of serious harm to Plaintiff."  *Id.* at 9.  Plaintiff contends that "[i]t is clear from the allegations in the Amended Complaint that any treatment provided by the Medical Defendants was grossly inadequate . . . and even purposefully deficient so as to comply with Denver Health's custom, policy, and practice of providing lacking care."  *Response* [#48] at 10.  Plaintiff further states that "[t]he Amended Complaint alleges that [the Medical Defendants] all personally fielded unambiguous complaints from [Plaintiff], either in

writing or in person, that he was having trouble seeing, and that none of them took reasonable steps to ensure that he received further medical treatment." *Id.* at 11.

In addressing these arguments, the Court considers the specific facts and circumstances surrounding Plaintiff's claim against each individual Medical Defendant and whether Plaintiff has sufficiently alleged the subjective component of the deliberate indifference test in order to state a plausible deliberate indifference claim.

### a. Defendant Crum (Individual Capacity)

Plaintiff asserts that Defendant Crum is the only medical doctor assigned to the Denver Jail. *Am. Compl.* [#30] ¶ 30. Plaintiff alleges that he had an appointment with Defendant Crum on or around November 5, 2015, during which they discussed the issues Plaintiff was having with his ulcerative colitis, back pain, and pain from a poorly healed broken foot. *Id.* ¶ 30. According to Plaintiff, a follow-up appointment with Defendant Crum was scheduled for November 19, 2015, but was "abruptly cancelled without any explanation" and did not occur until four days later, on November 23, 2015. *Id.* ¶¶ 30, 38, 39. Plaintiff states that he explained to Defendant Crum the issue he was having with his eyesight during the November 23, 2015 appointment. *Id.* ¶ 39. Plaintiff alleges that Defendant Crum agreed that Plaintiff should see an ophthalmologist but decided that they should wait a week before contacting such a specialist. *Id.* ¶¶ 39-40. Finally, Plaintiff states that, despite Defendant Crum's decision to wait one week before contacting a specialist, "the nurses had scheduled him for a follow-up appointment three weeks later." *Id.* ¶ 46. Plaintiff states that he was released from jail on December 12, 2015, without having seen Defendant Crum again, or having seen a specialist. *Id.* ¶ 51.

With respect to the subjective component of the deliberate indifference test, Plaintiff's allegations indicate that Defendant Crum first knew of Plaintiff's eyesight issues on November 23, 2015, and recommended a one-week wait before scheduling an appointment with an ophthalmologist. *Am. Compl.* [#30] ¶¶ 39-40. However, Plaintiff alleges no facts to suggest that the threat of vision loss was obvious to Defendant Crum or made known to him during or after this appointment. Defendant Crum appears to have responded to Plaintiff's reported symptoms by taking a "wait and see" approach to which Plaintiff did not object. "If a prison doctor . . . responds to an obvious risk with treatment that is patently unreasonable, a jury may infer conscious disregard.... But where a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted under our case law." *Self*, 439 F.3d at 1232. While Plaintiff makes the conclusory assertion that Defendant Crum failed to take reasonable steps to ensure that Plaintiff received further medical treatment, *Response* [#48] at 11, "[t]he decision that a patient's condition requires a specialist is a decision about the patient's course of treatment, and 'negligent diagnosis or treatment of a medical condition do[es] not constitute a medical wrong under the Eighth Amendment,'" *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980) (brackets in the original)).

Thus, Plaintiff has not sufficiently alleged that Defendant Crum's response to Plaintiff's condition was constitutionally inadequate in light of the information Plaintiff alleges Defendant Crum had at the time. Based on Plaintiff's allegations, construing them in the light most favorable to him, there is no indication that Defendant Crum knew that Plaintiff was at "a substantial risk of serious harm" following the November 23, 2015

appointment and before Plaintiff's December 12, 2015 release.  *See Farmer*, 511 U.S. at 842; *see also Duffield*, 545 F.3d at 1239 ("[T]he 'contention that [plaintiff] was denied treatment by a specialist is . . . insufficient to establish a constitutional violation.'" (quoting *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992)); *Self*, 439 F.3d at 1230 ("'[I]nadvertent failure to provide adequate medical care' is not enough, nor does 'a complaint that a physician has been negligent in diagnosing or treating a medical condition . . . state a valid claim of medical mistreatment under the Eighth Amendment.'" (quoting *Estelle*, 429 U.S. at 105, 106 (ellipses in the original)).

Additionally, the Court agrees with the Medical Defendants that the 'abrupt cancellation' of Plaintiff's November 19, 2015 follow-up appointment does not amount to deliberate indifference.  *Medical Defendants' Reply* [#51] at 4.  Plaintiff does not allege that the cancellation was for an improper reason or that Defendant Crum had any involvement in the cancellation.  *See generally Am. Compl.* [#30]; *see Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010) ("Anyone who has ever visited a doctor's office knows that some delays in treatment are inevitable, particularly absent a life-threatening emergency.").

Accordingly, the Medical Defendants' Motion [#34] is **granted** to the extent that Plaintiff's first claim against Defendant Crum, in his individual capacity, is **dismissed with prejudice**.  *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216-17 (10th Cir. 2006) (holding dismissal on the merits of the complaint is ordinarily with prejudice).

### b.  Defendant Rosales

The only allegation Plaintiff makes with respect to Defendant Rosales is that she reviewed Plaintiff's November 10, 2015 kite regarding his skin rash and, on the following

day, proposed a treatment plan for him to be evaluated "in nearly three weeks, on December 1, 2015." *Am. Compl.* [#30] ¶ 33.

With respect to the subjective component of the deliberate indifference test, the Court finds that Plaintiff has failed to allege that Defendant Rosales was aware of a significant risk of serious injury to Plaintiff and deliberately disregarded that risk. *See Farmer*, 511 U.S. at 837. Based on Plaintiff's limited allegations, construing them in the light most favorable to him, there is no indication that Defendant Rosales knew that Plaintiff was at "a substantial risk of serious harm" at the time she proposed a treatment plan. *Id.* at 842. Plaintiff's only description of his skin rash at this time is that it was "all over his body," that it did not itch, and that a "deputy agreed that the rash looked serious." *Am. Compl.* [#30] ¶ 31. Without more, it cannot be said that Defendant Rosales was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," *Self*, 439 F.3d at 1231, or "that the need for medical care was obvious," *Estate of Martinez*, 176 F. Supp. 3d at 1227. *See Stepnay v. Goff*, 164 F. App'x 767, 770 (10th Cir. 2006) ("[Plaintiff] may not avoid dismissal, however, by merely asserting conclusory allegations that his condition obviously required a doctor's attention because most skin conditions are not intuitively serious."); *compare, e.g., Oxendine v. Kaplan*, 241 F.3d 1272, 1278 (10th Cir. 2001) (holding that ineffectiveness of the prison doctor's reattachment and care of the inmate's severed finger was so obvious a lay person would recognize the need for a doctor's attention where the inmate's finger tissue blackened and necrified).

Furthermore, Plaintiff's limited factual allegation fails to demonstrate that Defendant Rosales had a culpable state of mind. *See Hill v. Corr. Corp. of Am.*, No. 07-

cv-00571-LTB-CBS, 2009 WL 2475134, at *4 (D. Colo. Aug. 11, 2009) (finding that the plaintiff's allegations that the "defendants failed to give adequate medical treatment" or that delays in medical treatment cause "severe complications and furtherance of pain and suffering" were inadequate to allege that the medical defendants had a sufficiently culpable state of mind constituting deliberate indifference).  A mere disagreement with the medical treatment received simply does not constitute a constitutional violation.  *Id.* Plaintiff fails to assert that his allegation regarding Defendant Rosales is anything more than a difference in opinion regarding appropriate medical care.  *See Callahan*, 471 F.3d at 1160.  Therefore, the Court finds that Plaintiff fails to allege anything more than a mere exercise of Defendant Rosales' medical judgment, which does not rise to the level of deliberate indifference in violation of the Eighth or Fourteenth Amendments.  *See Self*, 439 F.3d at 1232.

Accordingly, the Medical Defendants' Motion [#34] is **granted** to the extent that Plaintiff's first claim against Defendant Rosales is **dismissed with prejudice**.  *See Brereton*, 434 F.3d at 1216-17 (holding dismissal on the merits of the complaint is ordinarily with prejudice).

### c.    Defendant Snyder

Plaintiff's allegations against Defendant Snyder solely concern her response to Plaintiff's November 15, 2015 kite for medical attention.  *See Am. Compl.* [#30] ¶¶ 34-37. In the kite, Plaintiff indicated that he was beginning to experience blurred vision and that his preexisting rash was getting worse.  *Id.* ¶ 34.  Plaintiff alleges that Defendant Snyder's November 16, 2015 assessment "did not even acknowledge [Plaintiff's] complaint about his vision" but did "confirm that [Plaintiff's] rash was indeed all over his body" and that

Plaintiff had been using a cream for his rash for nearly two weeks without improvement. *Id.* ¶ 35. Plaintiff asserts that "[d]espite the serious complaint that [Plaintiff] was experiencing blurred vision, Defendant Snyder did nothing to address that issue." *Am. Compl.* [#30] ¶ 36. Plaintiff's only other allegation regarding Defendant Snyder is that she also reminded Plaintiff of his November 19, 2015 follow-up appointment with Defendant Crum. *Id.* ¶ 37.

With respect to the subjective component of the deliberate indifference test, the allegations concerning Defendant Snyder do not suggest that she was aware that Plaintiff was experiencing anything more than blurred vision and his growing skin rash. *See id.* ¶ 34. Again, although Plaintiff alleges the extent of his skin rash, he does not allege its severity with any specificity. *See id.* ¶¶ 31, 33, 35. Further, he does not state the degree to which his vision was blurred when he was seen by Defendant Snyder. *See id.* ¶ 34-36; *Alexander v. Richter*, No. 15-cv-766-WMC, 2017 WL 5634132, at *3 (W.D. Wis. Nov. 22, 2017), *aff'd*, No. 18-1115, 2018 WL 6720935 (7th Cir. Dec. 20, 2018), *reh'g denied* (Jan. 9, 2019) ("the need for an eye examination alone is generally insufficient to establish a serious medical need" (citing *Franklin v. McCaughtry*, 110 Fed. App'x. 715, 721 (7th Cir. 2004)). Thus, Plaintiff fails to demonstrate that Defendant Snyder was aware that Plaintiff's blurred vision and skin rash constituted substantial health risks requiring immediate treatment before Plaintiff's follow-up appointment with Defendant Crum only three days later on November 19, 2015. *See Estate of Martinez*, 176 F. Supp. 3d at 1227; *Self*, 439 F.3d at 1231, *Stepnay*, 164 F. App'x at 770. Although the follow-up appointment was subsequently rescheduled to November 23, 2015, Plaintiff nowhere alleges that Defendant Snyder was aware of or played a role in rescheduling the appointment.

Moreover, Plaintiff's allegations fail to aver specific facts demonstrating that Defendant Snyder had a culpable state of mind. *See Hill v. Corr. Corp. of Am.*, No. 07-cv-00571-LTB-CBS, 2009 WL 2475134, at *4 (D. Colo. Aug. 11, 2009) (finding that the plaintiff's allegations that the "defendants failed to give adequate medical treatment" or that delays in medical treatment cause "severe complications and furtherance of pain and suffering" were inadequate to allege that the medical defendants had a sufficiently culpable state of mind constituting deliberate indifference). Although Plaintiff alleges that Defendant Snyder "did not even acknowledge [the] complaint about his vision" and "did nothing to address that issue," *Am. Compl.* [#30] ¶¶ 35-36, Plaintiff presents no facts to suggest that this failure amounts to deliberate indifference rather than mere negligence. *Estelle*, 429 U.S. at 105 ("An inadvertent failure to provide adequate medical care cannot be said to constitute an 'unnecessary and wanton infliction of pain[.]'"). "'[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.'" *Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir. 1997) (quoting *Estelle*, 429 U.S. at 106); *see also Pressley v. Blaine*, 544 F. Supp. 2d 446, 454 (W.D. Pa. 2008) ("Medical malpractice may give rise to a tort claim in state court but does not necessarily rise to the level of a federal constitutional violation." (citations omitted)).

Plaintiff generally avers that "[t]he alleged facts raise an inference that the Medical Defendants had knowledge of [Plaintiff's] specific need for the attention of a medical specialist due to the seriousness of claims of declining vision." *Response* [#48] at 10 (citing *Self*, 439 F.3d at 1232). However, blurred vision or a skin rash are not the kind of ailments that often point to a risk of serious harm. *See Stepnay*, 164 F. App'x at 770

("most skin conditions are not intuitively serious."); *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) ("Delays that courts have found to violate the Eighth Amendment have frequently involved life-threatening situations and instances in which it is apparent that delay would exacerbate the prisoner's medical problems."); *Gillon v. Beeman*, No. 10-cv-00839-MSK-KMT, 2011 WL 6046929, at *4 (D. Colo. Dec. 5, 2011) (granting summary judgment where no facts demonstrate "the person [to whom plaintiff] complained . . . was aware that 'black spots' could be caused by a detached retina requiring an examination before the next optometric clinic"); *Alexander*, 2017 WL 5634132, at *3 (stating need for eye exam alone generally insufficient to establish serious medical need).

Accordingly, the Medical Defendants' Motion [#34] is **granted** to the extent that Plaintiff's first claim against Defendant Snyder is **dismissed with prejudice**. *See Brereton*, 434 F.3d at 1216-17 (holding dismissal on the merits of the complaint is ordinarily with prejudice).

### d. Defendant Jacobson

Plaintiff's allegations regarding Defendant Jacobson concern the medical kite Plaintiff sent after his November 23, 2015 appointment with Defendant Crum. *Am. Compl.* [#30] ¶ 42-43. Plaintiff alleges that this kite "plainly stated that he was seeing black spots in one of his eyes" and that his rash was continuing to get worse. *Id.* [#30] ¶ 42. Plaintiff asserts that Defendant Jacobson reviewed the kite and designated it as "routine" despite the apparent urgency. *Id.* ¶ 43. Plaintiff further alleges that the assessment notes, which the Court presumes for the sake of the argument were prepared by Defendant Jacobson, did not address Plaintiff's complaint about seeing black spots in one of his eyes and gave

no indication that Defendant Jacobson reported or addressed this request for medical attention. *Id.*

For the reasons set forth above, the Court finds that Plaintiff has failed to allege that Defendant Jacobson knew of and disregarded an excessive risk to Plaintiff's health with a culpable state of mind to satisfy the subjective component of the deliberate indifference test. Although Plaintiff himself believed that his medical condition was "anything but" routine at the time, he has not alleged sufficient facts to demonstrate that this was obvious to Defendant Jacobson. *Id.* ¶ 43; *see Estate of Martinez*, 176 F. Supp. 3d at 1227; *Gillon*, 2011 WL 6046929, at *4; *Alexander*, 2017 WL 5634132, at *3. Further, Plaintiff's mere allegation that Defendant Jacobson marked the kite as "routine" and that "there [was] no indication" that Defendant Jacobson addressed Plaintiff's request for medical attention is wholly inadequate to demonstrate a "sufficiently culpable state of mind." *Self*, 439 F.3d at 1230-31; *see Farmer*, 511 U.S. at 834.

Accordingly, the Medical Defendants' Motion [#34] is **granted** to the extent that Plaintiff's first claim against Defendant Jacobson is **dismissed with prejudice**. *See Brereton*, 434 F.3d at 1216-17 (holding dismissal on the merits of the complaint is ordinarily with prejudice).

### e. Defendant McCoy

Plaintiff's only allegation concerning Defendant McCoy is that, in response to Plaintiff's December 3, 2015 medical kite, Defendant McCoy acknowledged Plaintiff's complaint about his vision but scheduled Plaintiff for an appointment on December 21, 2015, despite the fact that Plaintiff was scheduled to be released on December 12, 2015. *Am. Compl.* [#30] ¶¶ 44-45.

Similar to Defendants Rosales and Snyder, Plaintiff's sparse factual allegations with respect to Defendant McCoy fail to demonstrate that this Defendant deliberately disregarded an obvious and significant risk of serious injury to Plaintiff. *Self*, 439 F.3d at 1231. Plaintiff concedes that Defendant McCoy acknowledged his request for medical treatment and, in serving his gatekeeper role, scheduled an appointment for Plaintiff to be treated. *Am. Compl.* [#30] ¶ 45. Although Defendant McCoy scheduled the appointment on a date after Plaintiff's planned release, Plaintiff does not allege that Defendant McCoy actually knew that Plaintiff would be released on December 12, 2015. Instead, Plaintiff only states that his release date was "a fact which he repeatedly told medical staff at the jail." *Id.* ¶ 45. Without additional allegations, it cannot be said that Defendant McCoy consciously disregarded a substantial risk to Plaintiff's health. At most, taking Plaintiff's allegations as true, Defendant McCoy was negligent in scheduling the appointment after Plaintiff's release date. *Self*, 439 F.3d at 1233 ("'[N]egligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation.'" (quoting *Perkins v. Kan. Dep't of Corrections*, 165 F.3d 803, 811 (10th Cir. 1999)).

Accordingly, the Medical Defendants' Motion [#34] is **granted** to the extent that Plaintiff's first claim against Defendant McCoy is **dismissed with prejudice**. *See Brereton*, 434 F.3d at 1216-17 (holding dismissal on the merits of the complaint is ordinarily with prejudice).

## C. Claim Two: Section 1983 Municipal Liability for Failure to Train and Supervise

In Claim Two, Plaintiff does not distinguish between Defendants Denver Health and Denver with respect to his municipal liability claim. *See Am. Compl.* [#30] ¶¶ 81-88.

He alleges that Denver Health and Denver "have repeatedly failed to properly train and supervise their employees to recognize and appropriately respond to medical emergencies." *Id.* ¶ 83. He states:

> These violations of inmates' constitutional rights to receive adequate medical care were so widespread and flagrant that in the proper exercise of its official responsibilities, Defendants City and County of Denver and Denver Health knew, or should have known, that its employees would fail to adequately identify and respond appropriately to medical emergencies, violating detainees' constitutional rights.

*Id.* ¶ 84. Plaintiff further alleges that Defendants Denver Health and Denver "were deliberately indifferent to the obvious serious medical needs of patients and jail detainees, knowing that potentially fatal consequences could be suffered by such individuals (including Mr. Weitzman) by failing to properly train and supervise their employees." *Id.* ¶ 85. Further, Plaintiff asserts that these Defendants maintained policies, customs, or practices that failed to properly train and supervise their employees which were the moving forces and proximate cause of the violation of Plaintiff's constitutional rights. *Id.* ¶ 86. Finally, Plaintiff alleges that the acts or omissions of Denver Health and Denver "caused [him] damages in that he suffered physical and mental pain during the four months he was incarcerated at the Denver County Jail, and ultimately lead to [his] significant vison loss in his right eye and some in his left eye." *Id.* ¶ 87.

"Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978) (footnote omitted). While *Monell* explicitly applies to municipal governments, the Tenth Circuit has extended the *Monell* doctrine to private entities acting

under color of state law.  *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir.

2003) (citations omitted).  A private entity however, "cannot be held liable solely because

it employs a tortfeasor -- or, in other words . . . cannot be held liable under § 1983 on a

*respondeat superior* theory."  *Id.* (emphasis added) (internal quotation marks omitted).

"[T]o hold the entity liable, the plaintiff must identify an official policy or a custom that is

the 'direct cause' or 'moving force' behind the constitutional violations."  *Aguilar v. Colo.*

*State Penitentiary*, 656 Fed. App'x. 400, 403 (10th Cir. 2016) (quoting *Dubbs*, 336 F.3d

at 1215).  To demonstrate "moving force," there must be "a 'direct causal link between

the action and the deprivation of federal rights.'"  *Ireland v. Jefferson Cty. Sheriff's Dep't*,

193 F. Supp. 2d 1201, 1226 (D. Colo. 2002) (quoting *Lopez v. LeMaster*, 172 F.3d 756,

763 (10th Cir. 1999)).  "The causation element is applied with especial rigor when the

municipal policy or practice is itself not unconstitutional, for example, when the municipal

liability claim is based upon inadequate training, supervision, and deficiencies in hiring."

*Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).  The

plaintiff must show that "the policy was enacted or maintained with deliberate indifference

to an almost inevitable constitutional injury."  *Id.* at 769.  "The deliberate indifference

standard may be satisfied when the [entity] has actual or constructive notice that its action

or failure to act is substantially certain to result in a constitutional violation, and it

consciously or deliberately chooses to disregard the risk of harm."  *Barney v. Pulsipher*,

143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted).

A municipal policy or custom can be in the form of: "(1) a formal regulation or policy

statement; (2) an informal custom amoun[ting] to a widespread practice that, although not

authorized by written law or express municipal policy, is so permanent and well settled as

to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions -- and the basis for them -- of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

A policy or custom can take the form of "the failure to adequately train . . . so long as that failure results from deliberate indifference to the injuries that may be caused." *Bryson*, 627 F.3d at 788 (internal quotation marks omitted). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A plaintiff must prove "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (quoting *Harris*, 489 U.S. at 390). Only where the failure to train amounts to "deliberate indifference" can an inadequacy in training "be properly thought of as a city 'policy or custom.'" *Connick*, 563 U.S. at 61. Notice to the entity is vital when a plaintiff is proceeding on a failure to train theory because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 61.

Although the Court concludes above that Plaintiff has failed to adequately allege a constitutional violation against Defendants Crum, Rosales, Snyder, Jacobson, and

McCoy, Plaintiff's Fourteenth Amendment deliberate indifference claim remains with respect to Defendant McFerrin who has not yet responded to the Amended Complaint or otherwise entered an appearance in this case. Accordingly, the Court proceeds to determine whether Plaintiff has sufficiently alleged a municipal custom, policy, or practice with respect to his municipal liability claim against Defendant Denver Health and Defendant Denver. Given that Plaintiff does not distinguish these Defendants within Claim Two, the Court addresses Defendant Denver Health and Defendant Denver together.

### 1. Defendants Denver Health and Denver

Denver Health and Defendant Denver both argue that Plaintiff's allegations fail to identify a policy or custom that was the moving force behind the alleged constitutional violation. *Medical Defendants' Motion* [#34] at 13-14; *Denver Motion* [#35] at 14-18. Specifically, Denver Health avers that Plaintiff fails "to identify a single, specific policy or unofficial custom of Denver Health that resulted in the alleged deprivation of his constitutional rights." *Medical Defendants' Motion* [#34] at 14 (citing *Walker v. Wegener*, No. 11-cv-03238-PAB-KMT, 2012 WL 4359365, at *10 (D. Colo. Aug. 30, 2012), *report and recommendation adopted*, 2012 WL 4355621 (D. Colo. Sept. 24, 2012)). In turn, Defendant Denver asserts that Plaintiff "'does not allege specific facts about who, what, where, and when that establish a plausible claim' that any policy, practice, or custom of Denver was the moving force behind the alleged constitutional deprivation." *Denver Motion* [#35] at 15 (quoting *Rehberg v. The City of Pueblo*, No. 10-cv-261, 2012 WL 1326575 at *5 (D. Colo. April 17, 2012)).

In opposition, Plaintiff states that he has "allege[d] that the uniform deliberately indifferent response by multiple caregivers to [Plaintiff's] deteriorating and permanently debilitating condition evidences a pattern of conduct and deliberately indifferent training and supervision by Defendant Denver Health, an inference to which Plaintiff is entitled at this procedural stage." *Response* [#48] at 18 (citing *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1319 (10th Cir. 2002)). With respect to Defendant Denver, Plaintiff argues that "Denver's failure to provide even the most basic level of supervision over its medical provider demonstrates deliberate indifference 'as to its known or obvious consequences' toward persons with whom their personnel come into contact." *Response* [#47] at 13 (citing *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)).

Even reading the Amended Complaint [#30] in a light most favorable to Plaintiff, the Court finds that Plaintiff has failed to properly allege a policy or a custom as the moving force behind his alleged constitutional violations. Plaintiff does not identify one official policy or custom, nor does he identify any specific deficiency in Defendants Denver Health and Denver's training or supervision. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989) (a claim for failure to train requires an identified deficiency in a training program that closely relates to the ultimate injury). Instead, he rests this claim on the vague assertion that Denver Health and Denver "have repeatedly failed to properly train and supervise their employees to recognize and appropriately respond to medical emergencies." *Am. Compl.* [#30] ¶ 83. He supports this assertion with only conclusory factual allegations that his injury "is just one example of Denver's overwhelmingly common deliberate indifference to the serious medical needs of inmates" and that "[t]he City of Denver has created, fostered, tolerated, and perpetuated an environment and

culture of deliberate indifference to the constitutional and statutory rights of citizens and residents." *Id.* ¶¶ 62-63.

One way of showing "deliberate indifference" is to cite a pattern of tortious conduct. *See Barney*, 143 F.3d at 1307-08 ("The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."). Because a pattern of consistent constitutional violations puts a municipality on constructive notice that its failure to train is a problem, by not fixing the pattern, the municipality can then be said to display "deliberate indifference." *Id.* In the Amended Complaint, Plaintiff attempts to "showcase Denver's longstanding pattern and practice of deliberate indifference to the serious medical needs of the inmates at its jail" by summarizing, without citation, five lawsuits where allegations of deliberate medical indifference were made against Defendants Denver and/or Denver Health. *Am. Compl.* [#30] ¶¶ 64-69.

However, as the Defendants correctly observe, Plaintiff fails to show that the incidents underlying these lawsuits were the same or substantially similar to his alleged constitutional injury. *See Watson v. City of Kansas City, Kansas*, No. 99-2106-CM, 2002 WL 922155, at *5 (D. Kan. Apr. 12, 2002), *aff'd sub nom. Watson v. Unified Gov't of Wyandotte Cty./Kansas City*, 70 F. App'x 493 (10th Cir. 2003) ("[I]n order for plaintiffs to rely on prior grievances to establish a custom or usage sufficient to establish a municipal policy or custom under Section 1983 principles, they must establish: 1) that the prior grievances were the same or substantially similar to the plaintiffs' constitutional injury; and 2) that the final policy-making authority of the municipality had actual or constructive

notice of the prior unconstitutional acts of employees to establish deliberate indifference." (citing *Brown*, 520 U.S. at 411).

Plaintiff draws no factual connection between these lawsuits and the present case. Rather, Plaintiff relies on these five cases from 2008, 2010, and 2017 (three of which resulted in settlements) to argue that "[t]he fact that these cases keep occurring again and again evince [sic] Denver's failure to train its employees to respond in an appropriate and timely manner -- indeed to respond at all -- to the serious medical needs of its inmates." *Response* [#47] at 15; *see Carter v. Morris*, 164 F.3d 215, 218 (4th Cir.1999) ("a plaintiff cannot rely upon scattershot accusations of unrelated constitutional violations to prove either that a municipality was indifferent to the risk of [his] specific injury or that it was the moving force behind [his] deprivation"); *Morris v. City of N.Y.*, No. 12-cv-3959, 2013 WL 5781672, at *11 (E.D.N.Y. Oct. 28, 2013) ("The fact that two of the defendants as well as a non-defendant supervising officer have had civil suits brought against them in the past that resulted in settlements is not even evidence of wrongdoing, let alone that the City has a custom or policy that fosters or results in wrongdoing."). Such conclusory allegations, however, fail to demonstrate that there was some unwritten policy or custom that was so permanent and well-settled as to constitute a "custom or usage" with the force of law. *Monell*, 436 U.S. at 691.

A related shortcoming of Plaintiff's claim is his failure to allege that the supposed indifference by Defendants Denver Health and Denver was the cause of his deprivation of constitutional rights. Plaintiff must show a "direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). Plaintiff has not alleged the requisite causation to make

his claim of municipal liability plausible.  He merely alleges, in a conclusory fashion, that Defendants Denver Health and Denver's "policies, customs, or practices in failing to properly train and supervise their employees were the moving forces and proximate cause of the violation of [Plaintiff's] constitutional rights."  *Am. Compl.* [#30] ¶ 86.  Given that "[t]he causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training...[,]" this element of Plaintiff's *Monell* claim is not satisfied. *Schneider*, 717 F.3d at 770 (citation omitted).

Accordingly, the Medical Defendants' Motion [#34] and Denver's Motion [#35] are **granted** to the extent that Plaintiff's second claim against Defendant Denver Health and Defendant Denver is **dismissed with prejudice**.  *See Brereton*, 434 F.3d 1213, 1216-17 (holding dismissal on the merits of the complaint is ordinarily with prejudice).

## D. Claim Three: Section 1983 Supervisory Liability for Failure to Train and Supervise

In Claim Three, Plaintiff alleges that Defendants Crum and Jane Doe, in their supervisory role, acted intentionally in failing to properly train and supervise nurses and other jail personnel to ensure the safety and well-being of detainees which was the moving force and proximate cause of the violation of Plaintiff's constitutional rights.  *See Am. Compl.* [#30] ¶¶ 90-95.  Defendant Crum seeks to dismiss this claim on the following grounds: (1) "Plaintiff has failed to adequately allege a violation of the Eighth Amendment;" (2) Plaintiff has failed to allege any facts demonstrating that Defendant Crum is a "supervisor" with a broad duty to "train and supervise deputy sheriffs, nurses, and other jail personnel in order to ensure the safety and well-being of detainees;" (3) Plaintiff fails "to allege any facts demonstrating that any conduct of these individuals

('intentional' or otherwise) constitutes a failure to train or supervise that is actionable under § 1983 and was the 'moving force' behind a violation of Plaintiff's constitutional rights." *Medical Defendants' Motion* [#34] at 15-16.

In a § 1983 lawsuit, "supervisory liability allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, or implements a policy which subjects, or causes to be subjected that plaintiff to the deprivation of any rights secured by the Constitution." *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015) (citations and internal alterations omitted). This is not the same as "liability under a theory of respondeat superior." *Id.* "A plaintiff arguing for the imposition of supervisory liability therefore must show an 'affirmative link' between the supervisor and the constitutional violation." *Id.* (internal quotation marks omitted)

Demonstration of an "affirmative link" between a supervisor and the alleged constitutional injury requires (1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind. *Id.* "Admittedly, the contours of supervisory liability are still somewhat unclear after the Supreme Court decided *Iqbal*, which articulated a stricter liability standard for personal involvement." *Id.* at 1248-49 (citations and internal alterations omitted) (citing *Dodds v. Richardson*, 614 F.3d 1185, 1198 (10th Cir. 2010) ("Much has been made about [the supervisory-liability] aspect of *Iqbal*, but consensus as to its meaning remains elusive."). Regardless, the Tenth Circuit's "particularized approach [still] applies with full force when a plaintiff proceeds under a theory of supervisory liability." *Cox*, 800 F.3d at 1249 (quoting *Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013). The Court continues to require plaintiffs to demonstrate "that each defendant acted with the constitutionally requisite state of mind" by "identify[ing] . . .

specific policies over which particular defendants possessed supervisory responsibility[ ] that violated their clearly established constitutional rights." *Pahls*, 718 F.3d at 1228.

A supervising prison official may be liable "[w]here there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016) (citation omitted). "It is not enough to allege 'general deficiencies' in a particular training program." *Id.* "Rather, a plaintiff must identify a specific deficiency in the entity's training program closely related to his ultimate injury, and must prove that the deficiency in training actually caused his jailer to act with deliberate indifference to his safety." *Id.* (internal alterations omitted).

In the Amended Complaint [#30], the only factual allegation Plaintiff provides with respect to Defendant Crum's supervisory role is that: "Upon information and belief, the nursing staff at the Denver Jail is often supervised and trained . . . by the medical doctor (Dr. Crum)[.]" *Am. Compl.* [#30] ¶ 23. Without more, Plaintiff's conclusory allegation that Defendant Crum failed to train subordinates who did not provide Plaintiff with appropriate medical treatment is insufficient to state a claim. Plaintiff's failure to allege an affirmative link between Defendant Crum's direct actions and the conduct of his subordinates is a fatal omission. Without this link, the Amended Complaint does not allege any purpose by Defendant Crum to violate Plaintiff's constitutional rights by failing to train his subordinates.

Accordingly, the Medical Defendants' Motion [#34] is **granted** to the extent that Plaintiff's third claim against Defendant Crum is **dismissed with prejudice**. *See*

*Brereton*, 434 F.3d 1213, 1216-1217 (holding dismissal on the merits of the complaint is ordinarily with prejudice).

## IV. Conclusion

IT IS HEREBY **ORDERED** that the Medical Defendants' Motion [#34] is **GRANTED**. Claim One is **DISMISSED with prejudice** with respect to Defendants Crum, Snyder, Rosales, Jacobson, and McCoy. Claim Two is **DISMISSED with prejudice** with respect to Defendant Denver Health. Claim Three is **DISMISSED with prejudice** with respect to Defendant Crum.

IT IS FURTHER **ORDERED** that Denver's Motion [#35] is **GRANTED** and that Claim Two is **DISMISSED with prejudice** with respect to Defendant Denver.

Remaining in this lawsuit are Claim One against Defendants McFerrin and Jane Doe and Claim Three against Defendant Jane Doe. *See Am. Compl.* [#30] at 13, 16.

Dated: March 31, 2019

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge